## 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

### MYERS, BY, &c. v. MYERS.

#### OCTOBER 6TH, 1887.

1. DIVORCE A MENSA ET THORO— *Grounds.*—Under Code 1873, ch. 105, § 7, divorce from bed and board may be granted for any conduct that renders cohabitation unsafe, that involves danger of life, limb or health. But there may be angry words, coarse and abusive language, humiliating insults, and annoyances in all the forms that malice can suggest, which may as effectually endanger life and health as personal violence, and which would therefore afford grounds for relief by the court.

2. IDEM—*Case at bar.*—Where husband kicked and beat without provocation his wife as she was engaged in nursing her infant, and afterwards obscenely threatened a repetition of the assault, chased her out of his house menacing her with a switch, and threatened "to split her open," and during a series of years kept up not only such personal violence, but a constant course of unkindness, insult and petty tyranny towards her, so as to make it notorious and cause his neighbors to testify that it would be unsafe for her and her child to dwell with him.

HELD :

> That she is entitled to a divorce *a mensa et thoro* from him, and to the custody of the infant child, and to a restitution of her property.

Appeal from decree of circuit court of Rockingham county, rendered January 19th, 1886, in a cause wherein Sarah J. Myers, by her next friend, Noah W. Berry, is complainant, and A. J. Myers, was defendant. At the hearing the court dismissed the bill, and the complainant procured an appeal. Opinion states the case.

*Grattan & Stephenson,* for the appellant.

*Charles E. Haas,* for the appellee.

RICHARDSON, J., delivered the opinion of the court.

The object of this suit was to obtain a divorce *a mensa et thoro*, with a decree for perpetual separation from her husband, and recovery of the exclusive control of her infant son, and also of her real and personal property.

The suit was instituted on the thirtieth of November, 1885, in said circuit court. The bill set out that the complainant, Sarah J. Myers, and the defendant, A. J. Myers, were married on the thirtieth of November, 1876; that she lived with her said husband from the time of this marriage until some time in August, 1879, during which period she was a consistent, faithful, and dutiful wife, and bore to him one child (Michael H. Myers), who at the institution of this suit was seven years old; but the bill charges that notwithstanding the complainant's dutiful conduct towards her said husband, yet he, within a short time after their marriage, in shameful violation of his marriage vows, treated complainant in the most cruel and brutal manner—indulging in the coarsest and most abusive language towards her, frequently striking, beating and kicking her—thereby rendering her most miserable and unhappy, and made it extremely dangerous for herself and infant child to live with him; that he became so violent and intemperate in his language and conduct towards her that his neighbors had him arrested and committed to the Western lunatic asylum, when complainant removed with her child to the home of her brother, where she has since resided; and that since her husband's return from the asylum he has continued to manifest the same cruel and relentless disposition; has frequently spoken in the most abusive manner of her, so that she has been, and is now, apprehensive of bodily injury—indeed, is apprehensive of danger to her life and that of her child, were she to attempt to resume her former conjugal relations with him; and

that he is constantly seeking to assert his marital rights as to complainant and her child, and, therefore, is a source of annoyance and danger to her.

The defendant answered, and, though the bill waived an answer on oath, he denied every other allegation, but admitted that under provocation he had once slightly kicked her.

Several depositions were taken. On the hearing, the circuit court dismissed the complainant's bill with costs, and from that decree the case is here on appeal.

The facts disclosed by the evidence are that the defendant was possessed of a violent temper, which he seems to have made little effort to restrain, especially at home and with respect to those subject to his control, and was arbitrary, coarse and surly; that his habitual treatment of his wife was unkindly, though she seems to have labored to please him; that on one occasion, when she and her white hired female help had retired to her room to put her child, (then a very tender infant) to sleep, he came home and forced his way into the room by the window, under pretense that the room door had been closed upon him, of which there is no evidence, and said to his wife—" I'll show you for closing the door on me," and declared that he was in his own house, and then jerked and kicked his wife around; that on another occasion, when she asked when they would go to the annual meeting, he got very angry and told her "he would split her open"; that he told her she was " the beatingest woman to talk to other men he ever saw"; that he kept six cows to milk, but turned off the white hired girl not very long after his wife had borne him their first and only child, saying he would not hire a girl any longer, that his wife could do the work herself; that one day his wife was seen to run out of the house, pursued by him, with a switch in his hand, he saying as she fled, "You had better run"; that she ran on to

the kitchen to get dinner, and explained to the hired girl that he had run her out of the house with a switch because she had sent a little boy to the store to sell a couple dozen eggs, to get a little cotton cloth to make pockets for his pants; that his mind was not then out of sorts, though it was before he was sent to the lunatic asylum; and that in October, 1885, he admitted to his wife's brother that he had kicked her ——, using vulgar language to designate the part of her body kicked by him—not to be repeated here; and after thus admitting that he had kicked her, said he didn't care who knew it, and that he would kick her or any other woman under similar circumstances.

The complainant's brother, the hired girl, a man who lived in the defendant's house as an employee for months, and several near neighbors, all of whom had had ample opportunities to know of that whereof they gave evidence, deposed that it would not, in their opinion, be safe for Mrs. Myers and her child to live with her husband, and all of them say that his temper and feelings towards her had not improved, and that on his visits to her at her brother's house, where she has made her home for several years, he is never kind and pleasant to her. On the other hand, several persons of inferior opportunities testified to a different opinion. It also appears, both from the answer and from the evidence, that at the death of Mrs. Myers' father, about 1882, she inherited from him real estate of the value of $18,000 or $19,000, and about $5,000 of personalty; and that her father had, after her said marriage, paid $2,600, one-fourth of the purchase-money of the farm purchased by the defendant near Mt. Crawford; and that the defendant's own estate was worth some $11,000.

It was also stated in the answer of the defendant, A. J. Myers, and proved that, in an interview between Mrs. Myers' brother, Samuel Bowman, and the defendant, which had been sought by the former with the hope of amicably

settling by articles of separation, this unhappy family dissension, the defendant proposed to Bowman to settle it on these terms : Defendant would surrender his right of curtesy in the real estate of his wife, and all the interests he might have in her personalty, and the possession of his child with permission for him to visit and see it, and she should surrender to him her interest (one-fourth) in the Mt. Crawford farm. This proposition Bowman declined.

With these facts before the court below, it pronounced the decree here for review.

This suit was brought under section 7 of chapter 105, Code 1873, which reads thus :

"A divorce from bed and board may be decreed for cruelty, reasonable apprehension of bodily hurt, abandonment or desertion."

At the threshhold the question arises, what constitutes such legal cruelty as will justify a decree for a divorce ? To this question, we find ready to hand, the answer given by this court, *per* Staples, J., in *Latham* v. *Latham*, 30 Gratt. 320-21. It is this: "According to the authorities, the cruelty which authorizes a divorce, is anything that tends to bodily harm and thus renders cohabitation unsafe ; or, as expressed in the older decisions, that involves danger of life, limb, or health." This is the *sœvitia* of the ecclesiastical law. But to this definition the learned judge adds: "I agree there may be cases in which the husband, without violence, actual or threatened, may render the marriage state impossible to be endured. There may be angry words, coarse and abusive language, humiliating insults, and annoyances in all the forms that malice can suggest, which may as effectually endanger life and health as personal violence, and which, therefore, would afford grounds for relief by the court."

Divorces have ever been granted both in England and in Virginia with great reluctance. See the opinions of Sir

William Scott in *Evans* v. *Evans*, in *Oliver* v. *Oliver*, in *Kirkman* v. *Kirkman*, and in *Holden* v. *Holden*, 1 Haggard's R.

The opinion of that eminent judge in *Evans* v. *Evans* is universally esteemed the most learned,.able and satisfactory opinion ever delivered upon the subject in either England or this country.

In his admirable work on Marriage and Divorce, Mr. Bishop, in a note to § 717 of his first volume, makes a lengthy extract from Sir Wm. Scott's opinion in *Evans* v. *Evans*, and after speaking of the opinion as one of the "master productions of Lord Stowell's luminous mind," says: "It has been regarded ever since as the leading authority on this subject, and has been approvingly commented upon in almost every subsequent decision, English or American. The following most material extract has in this way gained almost the weight of a statute," and * * then quotes from the opinion: "*What is cruelty?* In the present case it is hardly necessary for me to define it, because the facts here complained of are such as fall within the most restricted definition of cruelty; they affect not only the comfort, but they affect the health, and even the life of the party. I shall, therefore, decline the task of laying down a direct definition. This, however, must be understood, that it is the duty of courts, and consequently the inclination of courts, to keep the rule extremely strict. The causes must be grave and weighty, and such as show an absolute impossibility that the duties of the married life can be discharged. In a state of personal danger no duties can be discharged, for the duty of self-preservation must take place before the duties of marriage, which are secondary both in commencement and obligation; but what falls short of this is with great caution to be admitted. * * * * What merely wounds the mental feelings is in few cases to be admitted, where not accom-

panied with bodily injury, either actual or menaced. Mere austerity of temper, putulance of manners, rudeness of language, a want of civil attention and accommodation— even occasional sallies of passion—if they do not threaten bodily harm, do not amount to legal cruelty; they are high moral offenses in the marriage state, undoubtedly— not innocent, surely, in any state of life—but still they are not that cruelty against which the law can relieve. Under such misconduct of either of the parties—for it may exist on one side as well as on the other—the suffering party must bear in some degree the consequences of an injudicious connection—must subdue by decent resistance or by prudent conciliation—and if this cannot be done, both must suffer in silence." &c.

Now, in this eloquent summing up and presentation of the negative view of the subject, we see that Lord Stowell was especially careful to employ the appropriate qualifying expressions, such as "*mere* austerity of temper," "*occasional* sallies of passion," &c., which *do not threaten bodily harm*, and cannot, therefore, constitute that legal cruelty without which there can be no proper ground for a decree for a divorce; and these, and nothing more, are referred to by him in his eloquent admonition as the things which the suffering party must subdue by a decent resistance or by prudent conciliation, or, failing this, must submit in silence. Nowhere does that great judge say, or even intimate, that habitual unkindness, coarseness, and cruelty of deportment by a husband towards an unoffending wife; the use of coarse, insulting, and abusive language to her, though the result only of a violent and unrestrained temper; pulling her around and kicking her when she has at the breast her tender babe—their first and only child— and, with rod in hand, causing her to flee from him as if she were a mere domestic animal suddenly detected in some petty depredation—nowhere is it said that such con-

duct and treatment as this must be submitted to in silence. No, there is no intimation of the kind; nor can it be said that such treatment does not measure fully up to the most restricted definition of *legal cruelty;* nor that it does not amount to such cruelty as to render the proper discharge of the duties of the married life impossible; nor that it does not necessarily tend to the impairment of the health of both mind and body, and ultimately to the destruction of both, and does not afford ample ground for relief.

In the opinion referred to, Lord Stowell says: "In a state of personal danger no duties can be discharged, for the duty of self-preservation must take place before the duties of marriage, which are secondary, both in commencement and in obligation." And in another case ( *Waring* v. *Waring,* 2 Phil. 132, 1 Eng. Ec. 210, 211; S. C. 2 Hag. Con. R. 153), Lord Stowell observed: " The definition of legal cruelty is that which *may endanger* the life or health of the party." This is in accord with the definition given by the law lexicographers, and is in exact keeping with the definition given by Staples, J., in *Latham* v. *Latham, supra,* where it is said: "The cruelty that authorizes a divorce is anything that tends to bodily harm, and thus renders cohabitation unsafe; or, as expressed in the older decisions, that involves danger to life, limb, or health."

It was not until the act of February 17th, 1827, that the courts of this State were invested with jurisdiction to grant divorces. Under that act only a few cases in which divorces have been decreed or desired have come on appeal to be reviewed by this court, and these are *Bailey* v. *Bailey,* 21 Gratt. 43; *Carr* v. *Carr,* 22 Gratt. 168; *Latham* v. *Latham, supra,* and *Harris* v. *Harris,* 31 Gratt. 13. In only the first and third of these cases was cruelty alleged. In the first the charge was abandoned in the argument. In the third it was, as we have seen, considered, but the averment was not regarded as sustained by the evidence. In some of them

arose "reasonable apprehension of bodily hurt" as a distinct ground of divorce. But these two grounds are of such analogous nature that the discussion of one necessarily involves the consideration of the other. It is plain that if an act of legal cruelty has been committed, and there is evidence that the guilty party has threatened to repeat that or similar acts, and there is probability that the threat will be executed; or if it appear from the whole case that the conduct of the guilty party is such as tends to endanger the life, limb, or health of the other party, or such as to render cohabitation unsafe and improper, then the court can have no hesitation in granting the divorce on either ground.

In the case at bar, both "cruelty" and "reasonable apprehension of bodily hurt" are alleged by the plaintiff, and both grounds are abundantly sustained by the evidence. Not only did this coarse and unnatural husband assault and violently beat, without provocation, his young wife while she was engaged in nursing and putting to sleep her first born infant, but five years afterwards, in shamefully obscene language, he threatened that he would repeat the outrage. Not only did he chase his wife out of his house, menacing her with a switch, but on a more trivial occasion actually threatened "to split her open." Not only was he guilty of these acts and threats of actual violence, but his constant course towards her of unkindness, insult, and petty tyranny was so marked and notorious that all the household and neighbors knew of it, and, speaking from their knowledge, testified that, in their judgment, it would be unsafe for Mrs. Myers and her little child to dwell with this unnatural husband and father.

And what palliation is attempted to be made for such inhuman conduct? Why, it is said that these things happened anterior to his confinement in the lunatic asylum, from which he was released in 1881. The evidence, how-

ever, is that he repeated some of his threats just before the institution of this suit, and, from the temper displayed by him towards her, it is obvious that he would have repeated also his acts of cruelty, had she not kept away from his society and found shelter and safety at the house of her father and brother.

It is also suggested, in extenuation of the language of menace used by Myers concerning his wife, that she had deserted his house and carried off his child. Though this be true, yet as she had just cause, in the harsh and cruel treatment she received at his hands, to seek shelter and protection elsewhere, the desertion was, in the eye of the law, his, not her's. *Cralle* v. *Cralle*, 79 Va. 186.

The decree complained of is unquestionably erroneous, and must be reversed, with costs to the appellant, and such decree entered here as the court below should have entered, perpetually divorcing the complainant, Sarah J. Myers, and the defendant, A. J. Myers, "from bed and board," and securing to said Sarah J. Myers the exclusive custody and control of her said infant child, free from any molestation in any way by the said A. J. Myers; and also securing to the parties, respectively, so divorced the exclusive possession and control of their estates, real and personal, free from all claims and pretensions set up, and all encroachments and trespasses attempted or made by the other.

But as the said Sarah J. Myers owns and possesses an estate ample for the purpose, and much greater in value than that owned and possessed by the said A. J. Myers, it would, under all the circumstances of the case, be inequitable to decree—and this court refuses to decree—that the said A. J. Myers shall contribute to the support either of his said wife or of his child.

As to the control of the child, given to the mother, it is proper to say, by the common law the father is the legal guardian of the infant. The law gives it to him against

all the world. The right of the father, say all the authorities, to the custody of the legitimate minor children, of whatever age they may be, is perfectly clear—two well settled to admit of dispute. But by our statute (section 12, chapter 105, Code 1873) it is provided that upon decreeing a divorce, whether from the bond of matrimony or from bed and board, the court may make such further decree as it shall deem expedient concerning the estate and maintenance of the parties, or either of them, and the care, custody, and maintenance of their minor children, and may determine with which of the parents the children, or any of them, shall remain, &c.

In the light thrown by the evidence in this case upon the character and habits of the father, it is clear that he is not a proper person to be entrusted with the care, custody, and training of the child. Under such circumstances, it becomes the duty of the court, and common humanity requires, that the child be entrusted to the exclusive custody, care, and training of the mother. This we do, and all the more readily as there is not in the record even an intimation that she is not in all respects worthy of the high and sacred trust. This, too, is in accordance with the principle announced in repeated decisions of this court, the latest of which is *Coffee* v. *Black,* 82 Va. 567, and authorities cited.

For the reasons aforesaid, the decree of the circuit court must be reversed and annulled, a decree entered here as above indicated, and the cause remanded to said circuit court for such further proceedings to be had with respect to the real and personal estate of Mrs. Sarah J. Myers as may be necessary to carry fully into effect the decree here to be entered in respect thereto.

DECREE REVERSED.