## HARRY M. CROUCH *v.* EDNA F. CROUCH.

*Grounds for Divorce—Cruelty and Desertion—Insane Brother in Home.*

A husband who persists in keeping in his home a person who has been a dangerous lunatic and may again become dangerous, is guilty of cruelty entitling the wife to a divorce, if she continues to reside in the home despite her fear of such person.                                                        p. 613·

Such conduct on the part of the husband would justify the wife in leaving his home and render him guilty of constructive desertion if he declines to remedy the situation within a reasonable time.                                            p. 613

A wife who suddenly left her husband's home for the ostensible reason that he insisted in keeping there his brother, a dangerous lunatic, *held* not entitled to a divorce, she not having definitely warned her husband that she would sever the marriage relation if the brother remained, her departure not being called for by any outbreak on the part of the brother, who had lived.

there inoffensively four months, she refusing to discuss the matter with her husband after leaving, and it appearing that the latter was endeavoring to have the brother taken elsewhere.

pp. 613-618

The wife was not guilty of desertion in leaving the husband's home, in view of the husband's conduct in keeping there his lunatic brother, who had been and might again become dangerous, this justifying her leaving, irrespective of her intention in doing so. pp. 617, 618

In order that a separation of a husband and wife entitle one or the other to a divorce, there must be an actual breaking off of the matrimonial cohabitation, coupled with an intent in the mind of the offender to desert or abandon the other. p. 618

*Decided May 5th, 1926.*

Appeal from the Circuit Court for Baltimore County, In Equity (OFFUTT, C. J.).

Suit by Edna F. Crouch against Harry M. Crouch for divorce, in which the latter filed a cross-bill. From a decree in favor of plaintiff on the original bill, and a decree dismissing the cross-bill, defendant appeals. Decree on original bill reversed, and decree dismissing the cross-bill affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, DIGGES, PARKE, and WALSH, JJ.

*James W. Chapman,, Jr.,* and *Raymond S. Williams,* for the appellant.

*Charles M. Armstrong* and *Walter C. Mylander,* for the appellee.

WALSH, J., delivered the opinion of the Court.

On April 16, 1925, Edna F. Crouch, the appellee, filed her bill of complaint in the Circuit Court for Baltimore County asking for a divorce *a mensa et thoro* from her hus-

band, Harry M. Crouch, the appellant, on the ground of cruelty. Harry M. Crouch answered denying the charges of cruelty, and later filed a cross-bill asking for a partial divorce on the ground of desertion. The plaintiff in the original bill filed an answer to the cross-bill denying that she had deserted her husband and alleging that she had been compelled to leave him because of his cruelty. The issues thus presented by the parties were tried in open court, and after a full hearing the learned chancellor granted Edna F. Crouch a divorce *a mensa et thoro,* with alimony of fifteen dollars per week, and dismissed the cross-bill, and from this action Harry M. Crouch has appealed.

The parties were married in Baltimore City in 1915, and resided there until 1917, when the appellant purchased a house and about four acres of ground near Towson, and thereafter they lived there, though the husband continued to go to Baltimore every day to engage in his business, which was that of an automobile salesman.

In 1921 the appellant's brother, Samuel O. Crouch, who was a painter by trade and who had spent most of his life on the Eastern Shore, became subject to hallucinations, and the appellant and one of his sisters, Mrs. Forsythe, brought him to Baltimore, where he resided with the latter. He frequently visited the appellant's home at Towson over weekends, and on one of these occasions he greatly frightened the appellee by getting a shot gun and telling her there was some one after him. The appellee intimates in her testimony that he pointed the gun at her, but whether he did this or not, it is undisputed that he had the gun, that he was laboring under the delusion that some one in or around the house was after him, and that the appellee called the appellant from Baltimore to come out and look after his brother. As a result of this incident, and perhaps others of a less dangerous nature, the appellant and his sisters, after consulting a physician, had Samuel O. Crouch placed in the Sheppard-Pratt Hospital in September, 1921, and he remained there until

May, 1922, at which time he was discharged in the care of his brother and sisters.

At this time he had largely recovered from the hallucinations he had been having, and up to the time of the bringing of this suit there had been no recurrence of these delusions, nor had he given any evidence of being dangerous. According to the medical testimony in the record, it appears that he was mentally sub-normal, and that if placed under any sudden mental strain, or in any unusual situation, he might be unable to control himself, and the delusions might return in a form which would render him dangerous. At the time he entered the Sheppard-Pratt Hospital in 1921 he had what is known as *dementia praecox,* and during the early part of his stay at the hospital he had attacked one of the attendants, but when he was released from the hospital he had apparently overcome this difficulty, though, as we said above, the doctors testified that this condition might return. Upon first leaving the hospital, Samuel Crouch lived in Baltimore with his sister, Mrs. Forsythe, and occasionally visited his brother, the appellant. Later he was taken back to the Eastern Shore and boarded at two different places there for several years, returning to Mrs. Forsythe's residence in June, 1924. In December, 1924, disliking Baltimore City and being accustomed to life in the country, he moved, of his own accord, to the appellant's residence, and is still there. Mrs. Crouch states that after he went to the Sheppard-Pratt Hospital she was very much afraid of him, and it is conceded in the evidence that, after he came to the appellant's home in December, 1924, she told the appellant on a number of occasions that she did not want him to stay there, and that she insisted upon his being taken somewhere else, and Mrs. Crouch testified that it was because of her husband's refusal to remove his brother from their home that she left him in April, 1925. The appellant admits that Mrs. Crouch wanted the brother removed, but he denies that he ever refused to have him removed, and states that he was making

arrangements to have him go to Cleveland and live with his niece, and that Mrs. Crouch knew that these arrangements were being made.

The appellant's testimony regarding his efforts to have his brother go to Cleveland is corroborated, but it does not appear just when the niece in Cleveland could have taken the brother, the arrangements for his removal being apparently contingent upon the niece, who then lived in a small apartment, securing a home large enough to accommodate the brother. Mrs. Crouch, on the other hand, denies that she was ever advised that any such arrangements were being made, and states that her husband told her that his brother would have to remain in their home.

In addition to the charge of cruelty growing out of the presence of the brother, Mrs. Crouch testified to several acts of personal violence on the part of her husband, and brought two other charges which seriously reflected on his character, but we agree with the learned chancellor below that none of these matters were established by the evidence. There is also a great deal of testimony regarding various quarrels and disputes which these parties had during their married life, but a careful reading of the record does not show that one was more to blame than the other for these troubles.

The chancellor indicated quite clearly the impression which all the testimony made upon him, when, in the course of his opinion, he said: "If I followed really what I thought was the substantial equity in this case, I would dismiss both bills, and I would do that except for one element to which I have already referred. I can't see, taking this case by and large, considering all the testimony, taking in the whole picture, that either one of these parties has been entirely free from blame. Neither one is perfect and neither one has the right to expect the other will be perfect." The chancellor, however, concluded that the continued presence of the mentally infirm brother in the husband's home justified the wife in leaving, and, as both parties testified on the stand that they would not

live together again, he granted the wife a divorce *a mensa et thoro.*

We would have no difficulty in sustaining this decision, were it not for the manner in which the wife left, and the failure of the testimony as a whole to convince us that the presence of the brother was the real cause of her leaving, or that it was sufficient to warrant her leaving permanently. A wife undoubtedly has the right to refuse to live with her husband when he insists on keeping in his home a person who has been a dangerous lunatic, and who, according to the medical testimony, may become dangerous again. Such conduct if persisted in would, in our opinion, constitute cruelty on the part of the husband, if the wife continued to reside in his home despite her fears of the insane person, or it would justify the wife in leaving the husband's home and render the husband guilty of constructive desertion if he declined to remedy the situation within a reasonable time. "Permitting those under his authority so to conduct themselves toward his wife as seriously to impair her health constitutes cruelty on the part of the husband entitling the wife to a divorce." 19 *C. J.* 47. And it has also been held that "a wife is not guilty of desertion for refusing to follow her husband to a place of abode selected by him which would impair her health or safety, or comfort, or to a place among his relatives who are unpleasant to her, and who would interfere with her control of the home, at least if he was able to furnish a better one." 19 *C. J.* 60. And see also 38 *A. L. R.* 338, note; 13 *L. R. A.* (N. S.) 222, note; 9 *R. C. L.* 365, 366, secs. 151 and 152; and *Hoffhines v. Hoffhines,* 146 Md. 350. We have found no case in which the precise question presented by the record before us has been decided, but under the general rules above quoted, and on reason, we have no hesitancy in holding that a man cannot require his wife to remain in a home in which his insane brother also resides.

In the present case, however, we do not think the wife has satisfactorily proved that she actually left because of the brother's presence, and even if this was her reason for leav-

ing, we are of the opinion that under the circumstances of this case she is not justified in basing an action for divorce upon it. The evidence shows that in 1923 she left her husband and remained away about a month, not because of the presence of his brother, but because the appellant made his sister treasurer of a corporation he was forming, and the appellee's own testimony shows that she left him on April 14th, 1925, without any notice or warning whatever, and later refused to discuss with him her reason for leaving or the question of her returning. The record shows that the appellant's brother came uninvited to his home about the middle of December, 1924, that several weeks later the appellant injured his foot and was compelled to remain at home for about three months, that he resumed his work around the latter part of March, 1925, and that after he did so his wife drove into Baltimore with him each morning and returned in the machine with him each evening. The wife contends that she did this because she was afraid to remain at home with the appellant's brother, while the husband says she did it because she had tired of country life and preferred to spend the days in Baltimore City at her parents' home. On the morning of April 14th, 1925, she went in town with him as usual, left his car without in any way indicating that she would not return with him that evening, and then went to her father's home, telephoned for a truck, and in company with her mother and father went back to her home in Towson, and took from it everything she claimed to own and had these articles taken to her father's house. In the evening she telephoned her husband's office and not finding him in left word for him to call her, and when he did so about 5:30 P. M. she told him that she was not going back home with him, declined to see him for the purpose of talking matters over, said she was through with him, and hung up the telephone. Two days later she filed this suit for divorce. She testified that she had told the appellant she would leave if he did not remove his brother, but it does not satisfactorily appear even from her own testimony that she fixed any defi-

nite time for leaving, or that she made it clear that she intended to break up the marriage relation if he was not removed. In fact, she stated that she did not speak to her husband at all during the last month they were together, and while it is evident from other testimony in the case that she did speak to him during this time, her own statements would seem to preclude any claim that she remonstrated about the presence of the brother during that time, and indeed there is no claim that she did do so. The husband, on his part, while admitting that she told him at different times that she objected to the presence of his brother in their home, denies that she ever told him she would leave if the brother was not removed, and he stated further that he was making arrangements to have him removed, that his wife knew this, that these arrangements were finally completed in July, 1925, and that his brother has remained at his home since July on the advice of his counsel who feared that his sending his brother away while this suit was pending might be misunderstood. The record shows that while the appellant was at home with an injured foot the relations of the parties were for the most part quite friendly, that during this time the wife had a number of his business associates out at the house for dinner, that they played cards with certain friends and neighbors, none of whom observed any discord or friction between them, that about three weeks before the appellee left she gave a birthday party for the appellant and baked a birthday cake for him, that she went back and forth to town with him every day in his car, and slept in the same bed with him every night, and that on Easter Sunday, April 12th, 1925, just two days before she left, they went to church together. This testimony is certainly inconsistent with the appellee's statement that during this time their relations were strained to the breaking point. In fact, the only evidence which supports this contention of the appellee is that relating to a quarrel which she had with the appellant on Easter Saturday evening, during which she says he flicked a towel in her face five times, and the proximity of this

quarrel, in point of time, with her final departure, together with some statements about it in her testimony, rather indicate that this dispute, and not the brother's presence, was the immediate cause of her leaving on the following Tuesday morning. However, regardless of the reason or reasons she had, we do not think she was justified, under the circumstances of this case, in leaving finally as she did. We do not question her right to refuse to live in the house with her husband's brother, but it must be remembered that she had lived in the house with him about four months, that during this time he did nothing to indicate a recurrence of any dangerous tendencies, but on the contrary acted in a normal and inoffensive manner, painted the house, did odd jobs about the place, and apparently interfered with no one. In view of the lack of any evidence that the brother did anything to justify the appellee's sudden departure, her own failure to satisfactorily prove that she definitely advised her husband of her intention to leave him if the brother remained, and her refusal to discuss the matter with him after she did leave, we do not think the appellee is entitled to the relief she asks. In addition to her own precipitate conduct, the preponderance of the evidence shows that her husband was making an effort to have his brother taken elsewhere, and it is not disputed that the arrangements then contemplated can now be carried out.

It should also be remembered that the position of the appellant in this case was an extremely difficult one. His efforts to take care of his afflicted brother were certainly commendable, and while his wife undoubtedly had the first claim upon him, it is not unreasonable to hold that she should have co-operated with him as far as possible in his efforts to perform his duty to this brother. The appellant did not have sufficient means to employ anyone to look after his brother, nor did the brother have any substantial means of his own. There is no evidence which would justify us in saying that the brother's condition required him to be confined, and under the circumstances we cannot blame the appellant for

not wanting him committed to some state institution.  The brother belonged to that rather large class of unfortunates who, though not quite normal mentally, are nevertheless not sufficiently afflicted to require their being treated as insane, and whatever may be said as to the advisability of their being given their unrestricted liberty, we cannot condemn as unreasonable or unnatural the desire of his relatives to endeavor to take care of him themselves.  On the other hand, the appellant, in view of the medical testimony that his brother might suddenly become dangerous, could not require his wife to live in the same house with him, and we accordingly cannot treat the wife's leaving as being sufficiently unjustified to constitute desertion on her part.  The case is a difficult one to decide, but taking into consideration the interest which the State has in the maintenance of the marriage relation, and looking at the evidence as a whole, we are not convinced that either of these parties is entitled to a divorce.  The appellee was, in our opinion, acting within her rights in refusing to live in the same house with the appellant's brother, but we do not think she could live there with the brother for four months and then, without showing that she definitely advised her husband that she would sever the marriage relation, leave without any word of any sort, refuse to even see her husband, file suit immediately for a divorce, and base this suit on the presence of this afflicted brother in her home.  Her conduct seems to us to be inconsistent with her claim in this case, and while the continued refusal of the appellant, after due notice, to remove the brother, would have eventually given the appellee a right to a divorce, we do not think she is entitled to this relief under the evidence now before us.  Nor, as we said above, do we think the appellant is entitled to a divorce.  He cannot properly blame his wife for not staying with him while his brother remained in their home, and her leaving would not constitute desertion unless he removed his brother as promptly as he reasonably could, and she then refused to return.

In cases of this character it is inadvisable, if not impossible, to lay down any save the broadest general rules, because each case must be determined largely on its own peculiar facts and circumstances. *Buckner v. Buckner,* 118 Md. 112. In the present case, it can be strongly urged that the presence of the brother for four months in the husband's home justified the wife in breaking off the marriage relation and suing for a divorce, but against this the record shows that during this time the brother did nothing offensive or dangerous, that during three-fourths of the time the husband was home with an injured foot and so excused to some extent for his delay in having his brother taken elsewhere, that the wife gave no definite warning of her intention to leave, left without saying a word, and then refused to even talk matters over with her husband, and finally the preponderance of the evidence shows that at the time the wife left the husband was making arrangements to have his brother removed. Under these circumstances, we do not think the wife is entitled to a divorce. On the other hand, it can also be urged that if she is not entitled to a divorce then her leaving constituted desertion on her part entitling the husband to a divorce. This latter contention, however, loses sight of her right to decline to live with her husband as long as his brother remained in their home. It is not every separation of husband and wife that entitles one or the other to a divorce. "There must be an actual breaking off of the matrimonial cohabitation, coupled with an intent in the mind of the offender to desert or abandon the other." 19 *C. J.* 58. In the present case, however, the wife can hardly be said to be the offender, because she had a right to decline to live in the same house with the husband's afflicted brother, and hence, since her leaving was justified, her intention in doing so is immaterial, and will remain so until the brother is removed. It accordingly follows that under the testimony now before us the husband has failed to show any desertion by the wife entitling him to any relief.

It appears from the record that both of these parties now refuse to live together, and the situation in which they find themselves is undoubtedly regrettable, but the Court is not responsible for their errors of omission or commission, and we cannot grant either or both of them relief simply because their matrimonial affairs have gotten into an unfortunate tangle.

For the reasons heretofore given, the decree appealed from in No. 55 will be reversed and the bill dismissed, and the decree appealed from in No. 56 will be affirmed, both with costs to the appellee.

> *Decree in No. 55 reversed and the bill dismissed, and decree in No. 56 affirmed, with costs to the appellee.*