# 𝕾𝖙𝖆𝖚𝖓𝖙𝖔𝖓

## CARL B. MONTGOMERY v. JULIA LEONA MONTGOMERY.

September 6, 1944.

Record No. 2829.

Present, Campbell, C. J., and Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Walter W. Wood* and *R. Roy Rush,* for the appellant.

*R. S. Smith,* for the appellee.

HUDGINS, J., delivered the opinion of the court.

Appellant and appellee are husband and wife. They were married July 5, 1940, in Roanoke, Virginia. After the marriage the parties moved into a new home in Roanoke purchased by appellant. On September 27, 1942, appellee left her husband's abode and has not lived with him since. On October 24, 1942, appellee instituted this suit charging her husband with cruelty and constructive desertion and praying for separate maintenance. Appellant filed an answer denying the charges, alleging that his wife, without just cause, had deserted him, and praying that the suit be dismissed. Neither party sought a divorce. On the issues raised, the trial court heard the case on the pleadings and depositions of witnesses duly taken and filed. From decrees declaring that the wife was entitled to separate maintenance and fixing the amount at $60 a month, the husband appealed.

Appellee bases her claim for separate maintenance or alimony on the grounds, (1) that appellant's abnormal devotion to his mother, who lived in the home with them, was prejudicial to her marital rights, (2) that the mother was too "nosey," and (3) that the mother exercised constant supervision over her in the home.

The evidence, while in some particulars conflicting, is substantially as follows: The parties were courting or engaged for several years before the marriage. Each was over 30 years of age. Both were gainfully employed. Appellant is a crane operator for the Norfolk and Western Railroad Company and earns approximately $1,900 a year. Appellee, at the time of the marriage, had worked for more than 16 years, and for one year thereafter was employed by the Ameri-

can Viscose Corporation. Before the marriage appellant informed appellee that his mother would have to live with them. At that time appellee raised no objection to this additional member of the household. Soon after the marriage the mother moved into the home and remained there 20 of the 26 months that the parties lived together as husband and wife.

Appellee related numerous incidents which she contends show that her husband's love and devotion for his mother were abnormal. She said that, the night before they were married, appellant telephoned her that he would not keep his engagement with her because his mother wanted him to spend the evening at home. While the bride and groom were at the station waiting for the train on which to leave for their honeymoon, the husband telephoned his mother. Immediately after entering their room at the hotel in New York, her husband took a picture of his mother out of his grip and set it on the dresser. On one occasion, while appellee was ill, appellant took his mother to church and left appellee at home alone. When they returned and for some nights thereafter, they sat in chairs placed close together and entertained each other, "mumbling their conversation." When appellee entered the room they stopped talking. When she asked them what they were talking about, they replied, "Not about you."

The incidents relied upon to show that Mrs. Ada L. Montgomery was too "nosey" or inquisitive are as follows: Whenever appellee and appellant left the home for a visit to friends, or for other reasons, the mother would ask them where they were going, how long they expected to stay and when they would return, and appellant always told her. The mother would peep through the curtains and watch appellant and appellee in the back yard or at the front door. The mother always remained in the living room when friends of appellee came to visit and would embarrass them by participating in conversations which did not concern her. On one occasion, when appellee was ill and in her bedroom

upstairs, the mother brought two of appellee's close personal friends in to see her and, together with her 13-year-old granddaughter, stayed in the room. When the mother left to prepare a meal, she sent the granddaughter back to stay and hear the conversation between her and her friends.

When appellee was asked what she meant by her allegation that appellant's mother exercised constant supervision over her, she said: "Well, whenever we (husband and wife) would go out she (Mrs. Ada L. Montgomery) would have to know where we were going, if we went to the show she had to know where we was going and when we would be back and Carl would hang back and tell his mother where we was going, and if she did not know right then she would have to find out some way or other."

The mother's use of the telephone seems to have been a constant source of annoyance to appellee. She complained of it to her husband and he mentioned the matter to his mother. Thereafter the mother used the telephone only when appellee was out of the room. When appellee came in the room while the mother was telephoning, the mother would cease her telephone conversation with members of her family or other friends. Appellee complained of this fact, stating that the very fact that her mother-in-law stopped using the telephone when she entered the room showed that she was the subject of the conversation.

Appellee stated that these incidents and others of a somewhat similar nature so irritated her that her health became impaired and that she thought she would go "crazy" if she remained in her husband's home. There is no corroboration of appellee's testimony that her health had become impaired and that the incidents mentioned had been the cause thereof.

The general rule is that where a husband has committed no breach of marital duty he is under no obligation to provide separate maintenance for his wife. She cannot claim it on the ground of her own misconduct. *Carr v. Carr*, 22 Gratt. (63 Va.) 168; *Harris v. Harris*, 31 Gratt. (72 Va.) 13; *Haynor v. Haynor*, 112 Va. 123, 70 S. E. 531; Annotations, 82 A. L. R. 539.

■ ■ The 1934 amendment (Acts of 1934, p. 515) to Code, sec. 5111, providing that "upon decreeing that neither party is entitled to a divorce, the court may make such further decree as it shall deem expedient concerning the estate and the maintenance of the parties, or either of them * * * ," does not change this general rule. Appellee cites the statute but does not contend it is applicable. However, equity, independent of statute, has jurisdiction to entertain suits for separate maintenance or alimony on behalf of a wronged wife even though no divorce is sought. See *White* v. *White*, 181 Va. 162, 24 S. E. (2d) 448; *Heflin* v. *Heflin*, 177 Va. 385, 14 S. E. (2d) 317, 141 A. L. R. 391; *Almond* v. *Almond*, 4 Rand. (25 Va.) 662, 15 Am. Dec. 781.

The three grounds for divorce from bed and board in Virginia are set forth in the 1919 Code, sec. 5104, as follows: "A divorce from bed and board may be decreed for cruelty, reasonable apprehension of bodily hurt, abandonment or desertion."

The evidence restricts our attention to the single question —whether the conduct of the husband and his mother was so cruel and inhuman as justified his wife in leaving his home thereby making him guilty of constructive desertion.

■ In *Butler* v. *Butler*, 145 Va. 85, 88, 133 S. E. 756, we said: "The law does not permit courts to sever marriage bonds and to break up households merely because husband and wife, through unruly tempers, lack of patience and uncongenial natures, live unhappily together. It requires them to submit to the ordinary consequences of human infirmities and unwise selections, and the misconduct which will form a good ground for legal separation must be very serious and such as amounts to extreme cruelty, entirely subversive of the family relations, rendering the association intolerable." *Forbes* v. *Forbes*, 182 Va. 636, 29 S. E. (2d) 829; *Bennett* v. *Bennett*, 179 Va. 239, 18 S. E. (2d) 911; *Hendry* v. *Hendry*, 172 Va. 368, 1 S. E. (2d) 340.

The acts of cruelty relied upon are not the acts of the husband but the acts of the husband's mother, a member of

the household. Whether the conduct of a relative of one spouse living in the home with the husband and wife justifies the other spouse in dissolving the marital relations has been the subject of much litigation.

Appellee relies upon 17 Am. Jur. 204, 26 Am. Jur. 642, and *Brewer* v. *Brewer*, 79 Neb. 726, 113 N. W. 161, 13 L. R. A. (N. S.) 222, to support the contention that the conduct of the mother was so cruel and inhuman that she was justified in leaving her husband's abode. The language of the text in the two volumes of American Jurisprudence is very similar to the language in the opinion of *Brewer* v. *Brewer, supra,* which is regarded as a leading case on the subject. The facts upon which the decision in that case turned were that the wife had no voice in the management of household affairs. The home was dominated and controlled by the mother, who stated to her daughter-in-law that she was no housekeeper and not a fit wife for her son. On one occasion the mother assaulted her daughter-in-law. The wife not only occupied a subordinate position in the home, but her husband gave her no money to spend. These were the circumstances which caused the wife to leave the husband's home. Soon thereafter she gave birth to a child. She offered to live with her husband if he would provide a separate home for her. She stated that she was willing to live in the house with her husband's mother provided she should have control of that part of the house assigned to her.

Dealing with these specific facts, the Nebraska court said: "Whatever his filial obligation may be, a man may not bring his mother to preside in his new home. That place belongs to the wife. Neither may he, without her consent, take her to the home of the mother, there to be under her domination and control; and, when the wife objects to this, she does not thereby forfeit her right to support and maintenance."

The facts in *Hutchins* v. *Hutchins*, 93 Va. 68, 70, 24 S. E. 903, were that the husband compelled his wife to live on a farm in the same house with his mother and father while he was working in New York. The evidence showed that the

mother-in-law was the mistress of the household, that she was abusive and cruel to the wife, and on one or more occasions assaulted her so severely that the wife had to seek aid from neighbors. Finally, the mother-in-law accused the wife of stealing, which led to mutual recriminations in the presence of guests. On this occasion the mother-in-law struck the plaintiff on the head. The blow was so severe that the blood from the wound matted her hair and ran down her clothes to the floor. The wife's repeated demands for a separate house in which to live, even upon the same farm, were not heeded. Being fearful of further indignities, she left. This court, speaking through Judge Keith, said: "Looking to the statements of the bill and answer, and to these undisputed facts, we think the appellee is well warranted in charging that she has been cruelly treated. We are, of course, aware that it is the right of the husband to select the place at which his family shall live, and to say of whom the family circle shall consist. Notwithstanding the changes that have so greatly altered and ameliorated the position of the wife before the law, it still remains that the husband is the head of the family and that as such he should be obeyed and respected as long as he deserves respect and obedience. But this position of dignity in the family carries with it correlative obligations. He owes to his wife the duty of protection from whatever danger may threaten her, and to permit her to suffer cruelty and wrong at the hands of another, even though that other be his father or his mother, is as great a breach of duty as though they proceeded directly from him." See *Ringgold* v. *Ringgold,* 128 Va. 485, 104 S. E. 836, 12 A. L. R. 1383.

The evidence in this case shows that the wife was not subservient to the mother in her husband's home. She was complete mistress of that home. She arranged the furniture, the curtains and the decorations. She bought the groceries, planned the meals and determined the time when they should be served. The husband took her to visit their friends, to places of amusement and with him and his mother to church

when she wanted to go. When they were first married, the wife was annoyed by the many visits to her home of the husband's brother and sisters and their children. She evidently complained to her husband about this and apparently the visits became less frequent.

In the wife's brief it is said: "As unnatural and distasteful as it may be, it is clear that the wife and mother-in-law were rivals, and that the son and husband chose his mother."

It is true that the uncontradicted evidence reveals that the son is devoted to his mother and is thoughtful and solicitous of her welfare. His mother was a widow 66 years of age and in impaired health. She received $1,800 and a small farm from her husband's estate. At the time of the institution of the suit, she was also receiving $25 a month from her deceased husband's interest in an old furnace, but this monthly income was temporary. Part of the cash (the exact amount is not stated) received by the mother from her husband's estate had been expended for her medical care and hospitalization. Due to the mother's impaired health, Carl Montgomery and the other children did not think it advisable for her to live alone. None of her other children was so situated that the mother would be comfortable in his or her home, as none of them had an extra bed or bedroom for her. These facts were known to Carl Montgomery and, hence, before his marriage he informed his intended wife that his mother would have to live in the home with them. The intended wife made no objection at that time to this contemplated arrangement.

The record shows that appellee lacked love, affection and even consideration for her own mother. She testified that she did not notify her mother or members of her family that she contemplated marriage. She did not inform her mother that she had been married. She did not invite her mother to visit her after she was married. During the two years of her married life, she received letters from her mother and others addressed in her maiden name. This lack of consideration for her own mother may explain her failure to understand and appreciate the filial devotion of her husband.

It is conceded that on the date of the marriage appellant purchased his present home, which is valued at $3,500. From his gross annual earnings of $1,903.91, his employer deducted $60.28 for railroad retirement tax, $48.70 for victory and Federal income tax and $393.75 for war savings bonds, leaving $1,401.18, the net sum paid to him. He habitually kept $40 to $50 in cash at his home for the joint use of himself and his wife. At his wife's request, the balance of his earnings was deposited in the bank to the joint account of himself and his wife. Either of them could and did check on it at will. There was a balance of $2,000 in this account at the time of their separation.

Appellee deposited her savings and earnings in the bank to her own account. There was a balance of $1,200 in this account when she left her husband.

It is significant that the record contains no testimony tending to show that the mother quarreled with, criticized, or said an unkind word to or concerning appellee. She did not interfere with, or criticize, appellee in the management of household affairs. A careful study of the testimony of the wife and of the testimony of each witness introduced fails to show any evidence from which malice or ill will on the part of the mother toward appellee can be inferred. She was solicitious of the welfare of appellant and his wife and her other children and their consorts. This solicitude on the part of the mother and perhaps her unusual curiosity seems to have led her to take a great interest in the affairs and movements of those with whom she was associated, but she made no attempt to interfere with appellee or appellee's relations with her husband.

Appellee concedes that appellant was loyal and devoted to her. It is quite true that the evidence shows that appellant had a very high sense of filial obligation to his mother, but at no time did he permit this sense of filial obligation to override and supersede his marital obligations to his wife. He thought and said that he could fulfill both of these obligations. His exact words were, "I did not see any reason

why we should not be happy with the three of us there, there was plenty of room there for us at our house." His mother was interested in everything pertaining to her children and he was in the habit of telling her when and where he was going when he left the house, but he never asked his mother to go with him and his wife when they went out together unless his wife suggested it. It is apparent that, if appellee had exercised reasonable forbearance and patience with her mother-in-law and had discussed with her the trivial incidents which irritated her in the home, the sources of her discontents could, and doubtless would, have been removed.

The courts have found it difficult, if not impossible, to formulate a rule of general application as to what conduct of a husband's relatives will justify the wife in leaving the marital home, but have determined each case on its particular circumstances. The general effect of the decisions seems to be that the duty of the husband to provide a home not only extends to the material comforts in accordance with his means, but requires the furnishing of a home wherein the wife is free from abuse, ill treatment and unwarranted interference from the members of the household. *Hoffhines* v. *Hoffhines*, 146 Md. 350, 126 A. 112, 38 A. L. R. 332, annotations 338; *Crouch* v. *Crouch*, 150 Md. 608, 133 A. 725, 47 A. L. R. 681.

The marital duties of a husband do not require him under any and all circumstances to support and maintain his wife in a home separate and apart from other members of his family whom he is under obligation to support and maintain. As Judge Keith said in *Hutchins* v. *Hutchins*, *supra*, a husband does owe the wife the duty of protection from cruelty and wrong, and from whatever other danger may threaten her, but the evidence for appellee in this case does not prove that the husband failed in the performance of this duty. He provided her a home in keeping with his means. He did not suffer her to be abused, criticized, ill treated or interfered with in the management of the household affairs.

That part of the decrees of the trial court which required appellant to pay appellee $60 a month alimony is reversed, but that part which fixes the rights of the parties in separate property owned by each of them is affirmed.

*Reversed in part,*
*Affirmed in part.*

CAMPBELL, C. J., and GREGORY, J., dissenting.