ANNA WEINER JACOBS *v.* JOSEPH HOFFMAN
JACOBS
[No. 20, April Term, 1936.]

*Decided May 19th, 1936.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Eugene P. Childs* and *Harry J. Green,* for the appellant.

*Vernon Cook* and *George B. Woelfel,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court for Anne Arundel County divorcing the appellee *a vinculo matrimonii* from the appellant. In reaching the conclusion embodied in the decree, the court found that the appellant, Anna Weiner Jacobs, had abandoned the appellee, Joseph Hoffman Jacobs; that the abandonment had continued uninterruptedly for three years; that it was deliberate and final; and that the separation of the parties was beyond any reasonable expectation of reconciliation. Code, art. 16, sec. 38. The question presented is whether the evidence supports those findings.

The parties were married in Baltimore City on May 26th, 1901. There are two children of the marriage, Benedict W., the elder, aged thirty-three years, and Elmer H., the younger, aged thirty. The parties lived together, with occasional interruptions, until the autumn of 1930, when they separated, Mrs. Jacobs remaining in the home which they then occupied in Baltimore City, Jacobs removing to Creston Park, in Anne Arundel County, where he operates a chicken farm.

Jacobs filed the bill in this case on August 2nd, 1935, to secure a divorce *a vinculo matrimonii* from the defendant, alleging statutory abandonment as ground for that relief. He also alleged that the defendant and their two sons were about to take possession of his Anne Arundel County property, "besides creating a good deal of disturbance," and that on several occasions the two sons had severely beaten him. Mrs. Jacobs in her answer categorically denied those allegations, and affirmatively alleged that she had made repeated attempts to effect a reconciliation, but that the plaintiff had not only refused to consider that, but had refused even to talk with her, and that she was without resources or means of support other than an allowance of ten dollars per week from the plaintiff.

Jacobs' contention is that, prior to the separation, the conduct of his wife and their two sons towards him was insulting and abusive; that at times they attacked him physically; that on the evening preceding his leaving the Baltimore City home, September 25th, 1930, he and his wife quarreled over a request by him that she sign a paper guaranteeing his note for $75,000; that they nagged him until he left his bed and stated that he was going to Creston Park; that his wife and youngest son "jumped" on him; that in the struggle they "hurt him a plenty and sat on me and I struggled"; that the struggle lasted for probably two hours; that in the course of it the oldest boy came in and said, " * * * Let me fix him, I will fix him," but they motioned him away; that he then fell asleep and the next morning he left the home and went to Creston Park where he has since remained; that he

invited his wife to join him at Creston Park on the condition that the sons should not live with them; that he had in good faith attempted a reconciliation which his wife had refused; and that while she offered to resume their marital relations, the offers were not made in good faith.

Mrs. Jacobs' contention is that her husband is highly excitable, nervous, irritable, and emotional; that the incident did not occur as he described it; that what occurred was that she had already signed one paper guaranteeing the note, and when he, on October 25th, asked her to sign another, telling her that it was the same thing as the first paper she had signed, she asked him, why, if it was the same thing, it was necessary for her to sign another; that he then fell into a tantrum, became very angry, threw himself on the floor, beat his head with his fists, kicked his feet against the floor; that they placed him in his bed; that he then threatened to kill himself with a lamp cord; that she and Elmer sat beside him; that she said, "If you are going to go on about this I will sign the note"; that when he became calmer they left him; that the next morning, when he came down, she asked him if he would not have breakfast; that he answered, "No, indeed," and walked out; that later he called up and said to her, "If those boys dare to come down the country I will have them arrested"; that after that she made repeated efforts to effect a reconciliation, but that he not only refused to consider that, but declined even to see or talk to her.

The plaintiff in a suit instituted for the purpose of obtaining a divorce assumes the burden, ordinarily borne by plaintiffs in other proceedings, of proving facts necessary to justify the relief sought (*Wigmore on Evidence,* secs. 2483-2488; 19 C. J. 125 *et seq.*), and in this state that burden can never be met by the uncorroborated testimony of the plaintiff (Code art. 35, sec. 4; *Tomkey v. Tomkey,* 130 Md. 292, 100 A. 283). It was therefore incumbent upon Jacobs to prove, by some evidence in addition to his own testimony, the facts upon which he

relied for relief, to enable the court to weigh his testimony at all. *Tomkey v. Tomkey, supra.* Those facts were: (1) That the appellant had abandoned him; (2) that the abandonment had continued uninterruptedly for three years; (3) that it was deliberate and final; and (4) that the separation was beyond any reasonable hope of reconciliation. If he failed to furnish the kind and quantity of proof which the law requires of those facts, he failed to prove his case and the trial court was bound to dismiss his bill, whether his own testimony was believed or not. In other words, his own testimony, unless corroborated, proved nothing. The corroboration required varies with the circumstances of particular cases, and as the danger of collusion, which is the evil at which the statute is directed, increases or diminishes, in the same ratio the rule prescribed by the statute is applied with greater or less strictness (*Appel v. Appel,* 162 Md. 5, 158 A. 65), but under no circumstances may it be dispensed with altogether (*Tomkey v. Tomkey, supra; Twigg v. Twigg,* 107 Md. 676, 69 A. 517; 19 *C. J.* 133; *Garrett v. Garrett,* 86 N. J. Eq. 293, 98 A. 848; 9 *R. C. L.* 435). While the corroboration must extend to every element necessary to justify the relief sought (*Garrett v. Garrett, supra;* 9 *R. C. L.* 436), it need not in itself be sufficient to warrant that relief (9 *R. C. L.* 435), nor need it go to every particular statement found in the plaintiff's testimony, but it is sufficient if it lends substantial support to his testimony as to material and controlling facts (19 *C. J.* 134).

The evidence relating to abandonment may be considered under two heads, one, whether Jacobs' action in leaving his home in Baltimore City, in September or October, 1930, was justified by the conduct of his wife and sons, the other whether after that separation its continuation was due to his fault or the fault of his wife.

Dealing with those two questions in their order, there is literally no evidence of any kind to support Jacobs' version of the circumstances under which he left his home in the fall of 1930. Moreover, apart from the lack of

corroboration, Jacobs' description of the happenings of the night preceding the separation tends to support his wife's statement of what took place. He testified: "That your wife and son threw you on the floor? A. No, they threw me down on the bed and sat on me. Did you not get down on the floor that night yourself and rap your head and kick your feet? A. No, I was not on the floor at any time. * * * You finally went to sleep while they were holding you? A. I don't think I can tell you the exact scene that happened. I know I fell asleep and they let up on me. I want to know whether you fell asleep while they were holding you or whether you were free when you went to sleep? A. I have heard the story of the man with a beard going to sleep but whether he slept with the beard under the cover or over the cover I don't think it makes any difference. I don't remember. It occurs to me that you testified that your wife was quite bulky and heavy and possibly that would have a tendency to keep you awake? A. No doubt it would. Can you say whether your wife was sitting on you when you went to sleep or not? A. I know she sat on me while I was in bed and while I dozed off she got off me; that would be twilight." The testimony of Mrs. Jacobs and their two sons that Jacobs was nervous, excited, that he threatened suicide, and that they tried to calm him, is inherently more credible than that he went to sleep while his wife was sitting on him.

Turning to the second question, it may be said that it is consistent with both common sense and law that, if Jacobs' two adult sons treated him as he stated in his testimony, and that his wife insisted nevertheless that they remain in the household, his abandonment of it was justified. The husband, who supports and maintains the home, is regarded as the head of the family, and may within reasonable limits determine who shall reside in, or even visit it (30 C. L. 510; *Crouch v. Crouch,* 150 Md. 608, 133 A. 725), and even if it be assumed that the conduct of the sons towards him was all that it should have been, nevertheless he had the right to insist that they

live apart from him and his wife. On the other hand, his wife had no right to demand that they be permitted to continue to live with her in her husband's home as a condition to her continuing to live with her husband. That they did live there is undisputed, but apart from a statement by Jacobs that on one occasion he had said to his wife that Elmer must leave the home or he would, and that she replied (in May, 1930) "You leave the place, you get out of here," the evidence does not show that prior to the separation he requested his sons to leave the home, or that his wife insisted that they remain. He did leave his wife in May, 1930, and later filed a bill for divorce against her, but he dismissed it, and they resumed cohabitation. One of the sons, Elmer, testified that he and his brother were willing to leave the home at any time, and Mrs. Jacobs that she was willing to live with her husband apart from the two sons. That the sons were in the home with his consent as late as 1930 appears from the fact that he made one of them, Elmer, a partner in the chicken business, and the other, Benedict, secretary of the corporation which operated it, although, while they were all in that business and living on the place, in 1930, he applied for an injunction to restrain Benedict from coming on it.

Nor is his testimony that the sons had abused, insulted, and physically maltreated him at all convincing. The only testimony supporting it is that of a neighbor, Arthur D. Schuster, who said that on one occasion Benedict, called "Dick," was operating a motorboat in which the witness and Jacobs were riding; that Jacobs warned his son that he would ground the boat; and that the son "swore" at his father. On the other hand, Mrs. Schuster, who was an occasional visitor at the Jacobs home, said that the father and sons "got along" perfectly; that she never saw anything "but harmony"; another witness said that she had seen the father attempt to strike "Dick," but had never seen the sons attempt to strike the father. Mrs. Miller, who had been employed on the place for seven years and was there in 1930, said that the sons were

"always nice to their parents * * * never talked out of the way." Elizabeth Hall, who worked in the home for two years and a half preceding the summer of 1928, testified that the sons were "always nice" to their father; the two sons testified that they had always behaved respectfully to him, although one of them, "Dick," testified his father's attitude towards him was harsh and dictatorial. Mrs. Atherton, another neighbor, testified that the attitude of the sons to their father had always been kind and considerate, and that she had "never heard anything else," and Mrs. Mildred Gibbs, a daughter of Mrs. Atherton, said: "They were the most obedient boys I have ever come in contact with; they took things from their father that no other boy I know of would stand, for they were most obedient boys; their father bosses them around like little puppy dogs for this and for that; come here Elmer, go there; their father would do; that they were obedient; I never saw many more obedient boys in my life. What was the father's attitude towards his sons? A. Very domineering and he was a man who demanded lots of attention; he demanded that the boys step around for him and obey him. Q. You have known them and have associated with them for over a period of thirteen years? A. That is right, thirteen years."

That evidence was not sufficient to show that Mrs. Jacobs herself was guilty of any improper conduct towards her husband, that she condoned disrespectful or improper conduct on the part of their two sons towards him, that the two sons would not have left the home had he requested them to do so, or that had they left she would not have continued to live with him. It was therefore not sufficient to prove that he was justified in leaving her.

But it is suggested, first, that her conduct after the separation was so cruel and manifested such hostility towards him that it tended to corroborate his testimony that he left the home because she and the two sons made it impossible for him to live there in peace, comfort, or security, and indeed without a complete loss of self-respect; second, that the findings of fact of the chancellor should not be disturbed in the absence of manifest error.

Dealing with those questions in inverse order, it may first be said that the chancellor is not a witness, his function is to weigh evidence, not to furnish it, and his findings have the force of the evidence upon which they rest, no more, no less. On appeal, there is no presumption of law in favor of his conclusions which must be overcome; the case is determined upon the evidence which was before him. Where that evidence was taken orally in open court, there is always an inference that, because of the opportunity afforded him of observing the appearance and demeanor of the witnesses as they testified, he was in a better position to pass upon their relative credibility than an appellate court, which is limited to considering the bare printed record of their testimony. So where the case turns on credibility, and there is doubt, weight is naturally given to the fact that the chancellor who decided the case heard and saw the witnesses, and was therefore better able to decide the relative credibility of their testimony than the appellate court. Such an inference, however, can never be accepted as a substitute for actual testimony. The appellee suggests that the "findings of fact of an equity judge who has seen and heard the witnesses will not be disturbed unless the evidence clearly demonstrates error." That statement of the rule, if "demonstrate" is used to mean "to prove beyond the possibility of doubt," goes much too far, while if it is used to mean merely "to point out or indicate," it is not particularly helpful, because in every appeal from a court of superior jurisdiction it is necessary for the appellant to point out that the trial court erred. 4 *C. J.* 731; *Schultze v. State,* 43 Md. 295. A very clear and satisfactory statement of the rule is found in *Bortner v. Leib,* 146 Md. 530, 546, 126 A. 890, 896, where it is said: "The testimony was taken in open court, where the judge had an opportunity to see the witnesses, to hear their evidence fresh from their lips, and to observe their expression and demeanor, so that, in weighing the testimony and passing on its credibility, his judgment was informed by the manner and conduct of the witnesses while testifying.

The appellate court does not enjoy this advantage, and it has therefore no inclination to disturb the finding of the chancellor on issues of fact, especially when there is so much conflict in evidence, unless it be apparent that his determination is not supported by the clear weight of the proof." In that statement emphasis is placed upon the principle that the finding of the chancellor will not be disturbed unless it appears that it is "not supported by the clear weight of the proof," rather than upon any requirement that error be clearly demonstrated. The following cases cited by the appellee are consistent with the statement of the rule in *Bortner v. Leib: Oertel v. Oertel*, 145 Md. 177, 178, 179, 125 A. 545; *Sporrer v. Ady*, 150 Md. 60, 70, 132 A. 376; *Farmers' Milling & Grain Co. v. Urner*, 151 Md. 43, 50, 134 A. 29; *Klein v. Klein*, 146 Md. 27, 33, 125 A. 728; *Gimbel v. Gimbel*, 148 Md. 182, 187, 128 A. 891; *Coulston v. Baltimore City*, 109 Md. 271, 275, 71 A. 990; *Pattison v. Brydon*, 150 Md. 575, 584, 133 A. 328; *Coburn v. Shilling*, 138 Md. 177, 199, 113 A. 761.

In considering the second suggestion, a description of Jacobs and his family will aid in interpreting the significance of the acts and incidents upon which the appellee relies in support of his suggestion.

Jacobs is at this time sixty years of age. He is a member of the bar and at one time was engaged in active practice, but later engaged in the real estate business, dabbled in stocks, and in 1930 went into the chicken business. Prior to that time he had accumulated a large fortune, it may be inferred through stock speculation, which was entirely wiped out by losses which he attributed to the depression, and in 1934 he became a bankrupt, with assets of $150,000 or $200,000 and liabilities of $673,979. During the period of his prosperity, he had given his sons $500 and "worked it up" in the stock market to $18,000, and had also in the same manner accumulated five or six thousand dollars for his wife, but in the crash their savings were swept away with his.

He stated in his testimony that with the disappearance of his fortune the attitude of his family towards him

changed; that they blamed him for the loss of their money as well as his own; that they became abusive, censorious, and insulting, although prior to that time they had lived together if not "in perfect peace and harmony" at least with no more trouble than the average family would have, but there is other testimony that he had left his home before that and remained away for considerable periods of time without letting his family know where he was; that on one occasion he called Mrs. Jacobs a vile name, and when Dick, the oldest son, said, "You should not speak like that to mother," he threw a cup at the son inflicting a wound which required five or six stitches to close. He was emotional, irritable, nervous, and displayed a quick and at times violent temper. Prior to the separation, he appeared at times to be generous and devoted to his family, at other times bitterly hostile to them.

The two sons have been employed intermittently as they could find work since they left school, at times for their father, at other times for other employers. They both express a willingness to live apart from their parents, and apart from their father's statement there is nothing in the record which reflects adversely upon the character of either, other than the isolated statement of Schuster, that on one occasion when his father warned Dick that he was not steering a motorboat properly, he had answered, "Who the h—— do you think is driving this boat," an incident which the son denied.

There is little in the record to indicate that Mrs. Jacobs is different from the usual wife and mother striving under difficult circumstances to keep her family together. She appears to have been devoted to her husband as well as to her sons. The shock of her husband's losses and her own affected her as well as him, poverty after wealth added as little to her happiness as to his, she found fault at times with her husband's judgment, but withal she appears to have remained loyal to him and considerate of his welfare. The charge that the conduct of Mrs. Jacobs towards her husband after the separation was so cruel and so hostile that it corroborates his testimony concern-

ing her actions before the separation depends upon the significance to be given to two incidents, one important, the other trivial. The first incident was this: In the summer of 1935, Mrs. Jacobs, who had written several letters to her husband in which she asked him to meet her, drove with Miss Ida Block, a friend, and "Dick," her son, to Creston Park to see him. When she arrived, "Dick," who drove, remained in the automobile, and Mrs. Jacobs and Miss Block went to the house. They were met by a woman employed there and told that Jacobs was absent. They then sat on the porch to wait for him. When he finally came, it was dark, and as he walked towards the porch she saw that he limped, he had an infected foot; to avoid startling him Mrs. Jacobs called out, "Joe, don't get startled, it is me, Anna." Jacobs said that when he heard his wife's voice he called to his "man": " 'Harry quick call the police that woman is down here I don't want to talk to her and I don't want to see her.' He said 'go into the garage and close yourself in there I will get rid of her' and we did that. I heard her say this 'don't pay any attention to him he is just acting he is just putting on he is not scared.' This happened what time? A. I don't recall but I can get that information from the hospital records. If I told you it was August 1st? A. Knowing you as I do Mr. Childs I will take your word for it. Then as late as August 1st your wife came to your place and as soon as you heard her voice you ran and hid yourself in the garage? A. She startled me and I certainly did." Miss Block said that when Mrs. Jacobs said, "This is Anna," "he raised his hands and said Oh that woman is here murder call the police that woman is here and he continued to do that until he reached the garage door. Mrs. Jacobs followed him and she said Oh please don't act like that I only want to speak to you and I followed Mrs. Jacobs and I said Mr. Jacobs I would like to speak to you he evidently did not hear me he continued to holler in a loud voice as he could and call police that woman is here until he reached the garage door and he told the man

to lock the garage door and he called the police and the man closed the doors and he locked them and then we did not see Mr. Jacobs any more." Mrs. Jacobs said that when she called to him "he let out two most unearthly crys and threw his hands up and hollered Oh Oh Oh that woman that woman murder police get the police. I walked on the walk and he turned around with the sore foot and started running away, it must have certainly hurt his foot, I said 'Joe it is only me' he kept on yelling police murder get the police he called that out a number of times and Ida also came running after me I said 'Joe, this is Ida you know Ida Block'. He still kept on calling murder police and he went to the garage doors and the man apparently had just put the car in and walked out and Mr. Jacobs hollered to him close those doors get in the garage close those doors close those doors and the man closed the doors and closed Mr. Jacobs in the garage." Mrs. Jacobs, after that occurrence, attempted to consult Dr. Manfred S. Guttmacher as to her husband's mental and physical condition, and in his absence she saw Dr. Ralph P. Truitt, a psychiatrist. About that time complaint had been made to H. M. Sandrock, a justice of the peace of Anne Arundel county, that Jacobs had assaulted a boy, the son of a former employee. Pending that complaint Mrs. Jacobs complained to the magistrate of her husband's conduct, and asked whether she could have him examined by a physician. The magistrate then told her of the other charge against her husband, and, after consulting the state's attorney, notified Jacobs to appear before him. When Jacobs appeared, Dr. Truitt and Dr. Milfred Levy were present, and he was told that if he had no objection they would like to ask him some questions. As a result of their examination and the history of the case obtained from Mrs. Jacobs, Dr. Truitt testified that Jacobs was a psychopathic personality, egocentric, aggressive, unstable, that "it is a border line, not exactly insane, some have to be committed, most of them go to the Penitentiary they get in trouble like shooting people on their property. Q. Which he never did? A.

Not yet. I told his wife he was very likely to. You don't mean to say he is insane? A. It is a border line condition." Dr. Levy said that he was an extremely emotional, unstable individual with a large number of very strong paranoid tendencies, introspective, and egocentric. Dr. Guttmacher, who testified for the appellee, concluded his direct examination with this statement: "In my opinion the patient is certainly not committable, and seems to me he is not a border line case certainly so far as commitment is concerned. The term 'Border line' may have been used in regard to his being psychopathic their opinions differ tremendously, there are people called (Napoleon, Joan D'Arc and Abraham Lincoln) psychopaths, depends on how any one uses that term. That is a very vague term? A. Yes it is a very vague term."

In the course of the examination in the magistrate's office, Jacobs said that if any one entered his property and did not immediately leave, he would shoot without hesitation. He admitted that on one occasion when his sons were near his house that he ordered them away and threatened to shoot them if they did not leave. He was convicted and fined for striking the son of an employee, and on one occasion he left his son "Dick" swimming alone in the Chesapeake Bay miles from land. He said that he went but a few feet, but Mrs. Jacobs said he went about five miles from the son and the son that he did not return for about thirty minutes.

From these occurrences, considered in connection with the mental condition indicated by the incoherencies and contradictions obvious in Jacobs' own testimony, it cannot be said that Mrs. Jacobs' desire that her husband be examined by a competent psychiatrist was unreasonable or unnatural. And while he was not notified in advance that a physician would be present in the magistrate's office, every consideration for his legal rights was shown him. The state's attorney for the county was present, the examination was in the magistrate's office, he consented to it, and he talked with entire freedom to the

physicians, and the physicians themselves were competent and reputable members of their profession, one of whom placed his file at the service of Jacobs' own physician, Dr. Guttmacher. And Dr. Guttmacher himself was neither certain nor dogmatic in his diagnosis, for with commendable frankness he said: "Your examination of Mr. Jacobs has not been what you would term a thorough examination? A. Not as thorough as I would like to make, I think it is as thorough as some other people do. Q. And not thorough enough to base any final judgment on? A. I think it is to base some judgment on. I think it is thorough enough to make me feel morally certain that he is not a committable individual. I don't think thorough enough for me to feel I have thorough knowledge of his personal makeup and its degree of deviation from this picture that differs from your mind or mine of just what normal is. Q. Particularly so when he comes to you for his own examination for special purposes? A. I think that helps to complicate matters."

The other incident was that, on one of Mrs. Jacobs' trips to Creston Park to see her husband, when she found the door locked, she was about to break a window to effect an entrance, and that when he did appear she gave her husband a "tongue lashing." Proof of it was furnished by one Folger, but it also appeared from his testimony that it was Thanksgiving, the weather was cold, Mrs. Jacobs had gone down to take food and warm clothing to her husband, that he refused to speak to her, was hostile and upbraided Folger for bringing her down to see him. Human nature being what it is, under those circumstances, Mrs. Jacobs' display of temper, while regrettable, was not wholly unnatural, and supplies very slight corroboration of her husband's testimony as to her attitude towards him.

The appellee therefore not only failed to prove his charge that the appellant abandoned him, but such evidence as there is shows that he abandoned her, and that he did so with a fixed and definite purpose of finally terminating their marital relations, and it also appears

that the separation has continued uninterruptedly for more than three years.

During that period Mrs. Jacobs made repeated efforts to effect a reconciliation, but the defendant not only refused to consider a reconciliation, but refused to meet his wife, to correspond with her, to speak to her, or to permit her to come on the Creston Park property where he resided. He explains his attitude by saying that her offers were not made in good faith, and that she was unwilling to live with him unless the sons were permitted to remain in the home. It may be conceded that she had no right to burden her offer of reconciliation with any such condition (*Brewer v. Brewer,* 79 Neb. 726, 113 N. W. 161), but both she and the two sons deny that that condition was attached to her offers, and the evidence is clear that, notwithstanding the continuing and relentless hostility of the appellee, she made in good faith every reasonable effort to effect a reconciliation, and that the real reason for her failure was the fixed and inflexible opposition of her husband. In his own testimony he said: "I destroyed most of the letters she wrote to me. I did not think I ever needed them, and I did towards the last hate her so much that I did not want to see anything she wrote, so I destroyed it. * * * I paid little attention to her protestations of love and asking me for forgiveness, knowing it was all done for a purpose, and if she once got me in her clutches again I felt that would be the end of me. * * * But the letters Mrs. Jacobs wrote to you you proceeded to destroy them? A. I did. Did you keep this letter? A. Yes. Can you explain that, why you preserved this letter and destroyed the letters she wrote to you? A. When a letter would come from her I would tear it up and throw it in the waste basket as just another trap for me to fall into a trap and get into her clutches again. Then you wanted to destroy any trap she had made for you? A. That was the way I looked at it, and that was why I hated the letters, not because her letter was a trap but her protestations were a trap; it was not so much her letters of any conse-

quences to me but her protestations nauseated me, I knew her." His hostility extended to neighbors and friends who aided his wife in trying to effect a reconciliation, even to his mother who on one occasion accompanied his wife to Creston Park.

From this analysis of the evidence, it necessarily follows that the appellee failed to prove the abandonment upon which his right to relief rested, and that his bill should have been dismissed. The decree appealed from must therefore be reversed.

*Decree reversed and bill dismissed, with costs to the appellant.*