WESTERN MARYLAND DAIRY, INC. *v.*
LAWRENCE CHENOWITH, ET AL

[No. 53, October Term, 1941.]

*Decided January 13, 1942.*

The cause was argued before BOND, C. J., SLOAN, JOHNSON, DELAPLAINE, COLLINS, FORSYTHE, and MARBURY, JJ.

*Morris Rosenberg* and *George C. Clarke,* with whom were *Tydings, Sauerwein, Levy & Archer* and *Allan Sauerwein* on the brief, for the appellant.

*James J. Lindsay* for the appellees.

DELAPLAINE, J., delivered the opinion of the Court.

Western Maryland Dairy, Inc., a distributor of milk and other products in Baltimore, filed a bill of complaint against Lawrence Chenowith and also Charles J. Chenowith, trading as the Meadowbrook Dairy, his agents, servants and employees, to enjoin them from soliciting orders for dairy products from, or selling, serving or delivering, either directly or indirectly, dairy products to any of its customers contrary to a collective labor agreement between the complainant and Local Union No. 937, Milk and Ice Cream Drivers and Dairy Employees. The union, consisting of about 700 employees of the corporation, had agreed that no employee, on leaving its employ, would "solicit, serve or sell, directly or indirectly," milk or dairy products during the period of six months thereafter to any customers whom he had served during any part of one year next preceding the termination of his employment. The chancellor granted a temporary injunction, but after the hearing dissolved the injunction and dismissed the bill.

In the early days of the trade unions and brotherhoods in America, some courts were unwilling to enforce their agreements; but in recent years the courts have manifested a growing appreciation of their value in securing harmonious relations between employer and employee. It is now held in Maryland and by the great weight of authority that employees have the right to organize a union and to select their agents to bargain collectively with their employer with the object of promoting the welfare of the members; and if their collective agreement has been acquiesced in by a particular employee and it is not contrary to public policy, it is valid and enforceable at law or in equity. *International Pocketbook Workers' Union v. Orlove,* 158 Md. 496, 501, 148 A. 826; *Shinsky v. O'Neil,* 232 Mass. 99, 121 N. E. 790; *Christiansen v. Local 680 of Milk Drivers and Dairy Employees of New Jersey,* 126 N. J. Eq. 508,

10 A. 2d 168. Thus it has been held in Massachusetts that where an agreement between a dairy company and a labor union prohibited any employee from selling dairy products to his former customers during a period of 90 days after cessation of his employment, the agreement was binding upon any member of the union who worked under the agreement. *Whiting Milk Companies v. Grondin*, 282 Mass. 41, 184 N. E. 379. It has likewise been decided in Illinois that one who had driven a milk truck for a dairy company could be enjoined from soliciting his former customers within a period of two years after his discharge from the company, where such solicitation contravened an agreement between the company and his labor union. *Western-United Dairy Co. v. Nash*, 293 Ill. App. 162, 12 N. E. 2d 47. Of course, an agreement to refrain from engaging in competitive work during a specified period subsequent to the termination of employment will ordinarily not be enforced in equity, if unnecessary for the employer's protection and an unreasonable restriction upon trade and employment. *Dyar Sales & Machinery Co. v. Bleiler*, 106 Vt. 425, 175 A. 27. But the law is settled in Maryland that a covenant by an employee that he will not solicit customers of the employer for the space of one year after termination of his employment is valid and enforceable in equity, because the contract is only in partial restraint of the particular trade or employment and the restraint is confined within limits which are no larger than may be reasonably required for the protection of the employer. *Tolman Laundry v. Walker*, 171 Md. 7, 187 A. 836. If equity could not restrain an attempted breach of agreement between employer and labor union, the system of collective bargaining would be demoralized, for the remedy at law would often be inadequate. *Gregg v. Starks*. 188 Ky. 834, 224 S. W. 459. At the hearing of this case Lawrence Chenowith said he had served on union committees, and also admitted: "I knew about the covenant in the contract about not soliciting customers on the route that I served, if I left." Since he had been an active member of the

union and was familiar with and acquiesced in the terms of the agreement, and it did not impose unreasonable restraint, we must hold that the covenant was binding upon him.

The question remains for our consideration whether the complainant was entitled to injunctive relief under the facts and circumstances of the case. It appears from the evidence that in 1939 Charles J. Chenowith, after working for the complainant for many years, started in business for himself, and Harry F. Meyer, who also had been an employee of the complainant, went to work for him. It further appears that on December 3, 1940, Lawrence Chenowith, who had been a salesman in the Harford Road section for many years, and was serving 254 customers on this route, left the employ of the complainant. Prior to that day he told a number of his customers that he intended to leave its employ. Although he denied at first that he had told any of them that he was going to work for his brother, he finally admitted: "I don't know how many I told that I was leaving. * * * I don't know how I determined to whom to tell, to which customers to tell that to. I just picked some customers at random. * * * I did tell some few people that were very familiar with me, yes, that I was going with my brother at Meadowbrook." Within two days 23 of his customers had stopped their orders. Within two weeks 73 customers had discontinued. By the time of the hearing the total had reached 94. According to the records of the company, the loss of customers on a milk route when a driver leaves is generally less than 1 per cent, and never more than 10 per cent, whereas the loss on this route had already exceeded 35 per cent. It was contended by the complainant that while Lawrence knew that the union agreement forbade him to solicit his old customers, he and his brother had concocted a scheme to evade the covenant. It appears that Lawrence decided to take Meyer's route in the York Road

section in the hope of avoiding the appearance of breach of covenant, while Meyer took Lawrence's old route.

A number of instances of breach of covenant were produced by the complainant. One of the customers on Ailsa Avenue admitted on the witness stand that Lawrence Chenowith had asked her to buy milk from him. She testified: "Well, I think he mentioned something of the fact, yes, he said he was going with his brother, and asked me if I would go and try the milk, * * * and I did try it." It was then shown that Lawrence was seen in a Meadowbrook milk truck on Ailsa Avenue about 4 o'clock in the morning of December 8. It was claimed by Charles J. Chenowith that the order of the new customer had been "turned in" by Meyer, and that the only reason why Lawrence was riding in the milk truck was to point out to Meyer where to deliver the milk. However, this is a clear instance of violation of the agreement that within the time specified no employee would "solicit, serve or sell, directly or indirectly." Among the other witnesses were Hugh M. Ward and Raymond Little, route foremen, who took Chenowith's successor over the route and introduced him to the customers on December 3. After they came out of the house of a customer on Southern Avenue, Lawrence Chenowith entered the house and conferred with the customer for some minutes. He gave the following version of the incident: "Well, she was my customer. I had a right to. I was employed by the dairy. She might want to buy something. * * * It was my duty. I had not been relieved yet." But according to Ward, Lawrence said: "I didn't think they could be that rotten." To his statement Ward replied: "I don't think they are rotten. * * * They are out to protect their trade as well as you are."

Little testified that Lawrence said: "Well, that's one less they will have to serve, one less customer the Western Maryland will have to serve after this." It was

contended by the defendants that it was Meyer, and not Lawrence Chenowith, who had solicited the customers, and that Meyer did not mention Lawrence Chenowith's name to the customers. However, when an Elsrode Avenue customer was asked on cross-examination: "When did Mr. Meyer tell you that Lawrence Chenowith was with the Meadowbrook Dairy?" she replied: "When he solicited me. It is true that the defendants produced a number of customers who testified that they had not been solicited directly by Lawrence Chenowith. But the complainant did not contend that he had personally solicited every one of the 254 customers. Moreover, even though the dairy company may have been deprived of only a single customer by his direct solicitation, his conduct would amount to an injury, small though it may be, forbidden by the covenant. *Capital Laundry Co. v. Vannozzi*, 115 N. J. Eq. 26, 169 A. 554. In view of all the facts and circumstances in the case, we conclude that the complainant was entitled to injunctive relief against Lawrence Chenowith until June 3, 1941.

The court also finds that the complainant was entitled to injunctive relief against Charles J. Chenowith, his agents, servants and employees. As long as a collective labor agreement continues in force, it should be the duty of the court in a proper case to enjoin any conspiracy on the part of either side to breach it. It is a well-established rule that a collective labor agreement is not to be construed narrowly and technically, but broadly and in such a way as to accomplish its evident aim of promoting industrial harmony, and hence such an agreement ought to be kept faithfully and without subterfuge by both employers and employees, for in no other way could confidence between capital and labor be maintained. *Yazoo & Mississippi Valley R. R. Co. v. Webb*, 5 Cir., 64 F. 2d 902; *Rentschler v. Missouri Pacific R. R. Co.*, 126 Neb. 493, 253 N. W. 694, 95 A. L. R. 1. If, for illustration, a person is forbidden by an agreement

to solicit his former customers, the mere act of stopping in front of their homes on the route would amount to solicitation, even though he does not utter any words of solicitation. *Burnham v. Burnham*, 154 Md. 349, 140 A. 361. A fraudulent conspiracy, sufficient to serve as the basis for an action in a civil case, is the confederation of two or more persons to cheat and defraud, when the design has actually been executed by the confederates with resulting damage to their victim. *Rent-A-Car Co. v. Globe & Rutgers Fire Insurance Co.*, 161 Md. 249, 260, 156 A. 847. When individuals associate themselves together in an unlawful enterprise any act done by one of the conspirators is in legal contemplation the act of all. The mind of each being intent upon a common object and the energy of each being enlisted in a common purpose, each is the agent of all the others, and the acts done and words spoken during the existence of the enterprise are consequently the acts and words of all. As the breach of a contract is unlawful, it is unlawful for a third person knowingly to aid the maker of a contract in breaking it. If the maker combines with others to break the contract, their conduct is unquestionably a conspiracy which entitles the other party to the contract to recover against conspirators any damages he may sustain. *National Linen Service Corporation v. Clower*, 179 Ga. 136, 175 S. E. 460, 466. It is also indisputable that a conspiracy may be proved by circumstantial evidence, for in most cases it would be practically impossible to prove a conspiracy by means of direct evidence alone. Conspirators do not voluntarily proclaim their purposes; their methods are clandestine. It is sufficient if the proven facts and circumstances, pieced together and considered as a whole, convince the court that the parties were acting together understandingly in order to accomplish the fraudulent scheme. Thus a conspiracy may be established by inference from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation and relation of the parties at the time of the commission of the acts, the motives which

produced them, and all the surrounding circumstances preceding and attending the culmination of the common design. *Addison v. Wilson,* 238 Ky. 143, 37 S. W. 2d 7, 11; *Stoner v. Wilson,* 140 Kan. 383, 36 P. 2d 999; *Siemon v. Finkle,* 190 Cal. 611, 213 P. 954; *Hedrick v. Perry,* 102 F. 2d 802, 806.

It is well settled that the right to an injunction is not absolute, but lies largely within the sound discretion of the chancellor. For example, the chancellor may properly refuse the writ where it will do the complainant little good and cause the defendant great harm. It has been said that the application for an injunction is addressed to the sound conscience of the chancellor, acting upon all the facts and circumstances of each particular case; and since the chancellor has the right to require a full and candid disclosure of all the facts, he may refuse to exercise the extraordinary power of injunction if a full disclosure has apparently not been made. *American-Stewart Distillery v. Stewart Distilling Co.,* 168 Md. 212, 219, 177 A. 473. But while the findings of the chancellor on issues of fact in any case are presumptively correct and should not be lightly disturbed, they are not conclusive; and if it is manifest that they are not supported by the clear weight of the proof, the decree will be reversed. *Jacobs v. Jacobs,* 170 Md. 405, 414, 185 A. 109. Hence, notwithstanding that the granting or withholding of an injunction rests largely in the sound discretion of the chancellor, and his decree will not be disturbed on appeal unless it clearly discloses an improvident exercise of judicial discretion, nevertheless his decree will be reversed by the Court of Appeals if it clearly appears that there has been an abuse of discretion showing a disregard of the facts or an obvious error in the application of the principles of equity. *Phoenix Insurance Co. v. Carey,* 80 Conn. 426, 68 A. 993; *Smart v. Boston Wire Stitcher Co.,* 50 R. I. 409, 148 A. 803; *Gemmell v. Fox,* 241 Pa. 146, 88 A. 426; 28 *Am. Jur., Injunctions,* Secs. 35, 328.

It is now too late to grant an injunction in this case but there are substantive rights to be determined.  Before the temporary injunction was issued, the complainant was required to give a bond in the penalty of $1,000 to indemnify the defendants for any costs and damages occasioned by the issuance of the injunction in the event the injunction was rescinded.  If we do not determine the primary right of the complainant to a writ of injunction, then the complainant will not have prosecuted the cause with effect, and the liability under the bond would become fixed for costs of suit as well as possible damages; whereas our determination now that the complainant was entitled to an injunction would discharge the bond.  *Tolman Laundry v. Walker*, 171 Md. 7, 15, 187 A. 836. It is the opinion of the court that the chancellor's decree dissolving the injunction and dismissing the bill should be reversed.  We also remand the proceedings because the complainant prayed for an accounting of all profits made by the defendants through the alleged unlawful conduct.

*Decree reversed, and cause remanded, with costs.*