# Richmond

### Sena Roberts Ward v. Clarence J. Ward.

January 13, 1947.

Record No. 3143.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*S. B. Campbell* and *Chas. H. Funk*, for the appellant.

*Lewis Preston Collins* and *R. Crockett Gwyn, Jr.*, for the appellee.

HUDGINS, J., delivered the opinion of the court.

Sena R. Ward filed a bill in which she charged her husband with cruelty, constructive desertion and non-support. Clarence J. Ward, her husband, in his answer, denied the charges and pleaded condonation of the one act of cruelty charged. He also filed a cross-bill alleging desertion. The trial court held that neither party was entitled to a divorce *a mensa et thoro* and dismissed the case.

Mrs. Ward, on this appeal, assigns as error the refusal of the trial court to grant her any relief. Mr. Ward assigns no cross-error and asks that the decision of the chancellor be affirmed.

The parties were raised on adjacent farms in the Sugar Grove neighborhood, Smyth county, Virginia. Both attended Berea College. Mrs. Ward took her A.B. degree there and did graduate work at the Universities of Kentucky, Virginia and Columbia. Mr. Ward, after attending Berea College a short time, attended the Universities of Michigan and Columbia. At the time of their marriage in 1932, Mrs. Ward was teaching in West Virginia and Mr. Ward was connected with the United States Public Health Service at Salem, Virginia. Later, he was appointed the health officer of Roanoke county. By mutual consent, their marriage was kept secret for eighteen months or more. Thereafter the parties lived together in an apartment in the

Homestead Hotel at Salem. Mrs. Ward continued to teach until the spring of 1935, when her first child, a daughter, was born. After Mrs. Ward's father died in 1937, her mother moved to Salem and lived with her son-in-law and daughter until her death in 1940. Mrs. Ward inherited from her parents a mill, a dwelling house and a one-third interest in a farm at Sugar Grove.

The parties seemed reasonably happy until the spring of 1940, when Mrs. Ward left Salem to visit her home at Sugar Grove. While there, the second child was born. Mrs. Ward repaired the dwelling and mill and began grinding grain.

She made one excuse after another for declining her husband's frequent requests to return to Salem and live with him. Mr. Ward lived in and maintained the same apartment in Salem, in order to be available to the public for the performance of his duties as a health officer. Every two weeks for four years he visited his wife in her home at Sugar Grove, more than one hundred miles from his business. These conditions were not calculated to nurture mutual respect, forbearance or love. It appears from Mrs. Ward's own testimony that she was more interested in operating the mill than she was in maintaining a suitable home for her husband and children. In numerous letters she threatened to send her children to her husband in Salem and enter the military service as a nurse or technician.

Mrs. Ward, against her husband's advice and over his objection, operated the mill herself, at times lifting bags of grain, flour and meal. After she failed to make a substantial profit from the mill, she conceived the idea of leasing it and her dwelling to an experienced miller. She was unwilling to return to her husband's abode in Salem but demanded that he order his brother and sister (Mrs. Crockett) to vacate the modern farm dwelling on his farm at Sugar Grove and permit her to live there. Her husband replied that his earnings did not justify him in supporting her and the children in one place and in maintaining another establishment for himself. He also stated that he was renting a farm from his sister and

operating it in conjunction with his own. In order to do this, he was required to permit his sister to live in the dwelling on his farm, as there was no dwelling on her place. In prior years, Mr. Ward, his brother, Scott Ward, and Mrs. Crockett were engaged in joint farming operations but now his brother is farming alone, though living with his sister on Clarence J. Ward's farm in accordance with an agreement 'made when the house was remodeled.

·This farming arrangement was not satisfactory to Mrs. Ward, who seemed incensed because Mrs. Crockett was living on her husband's farm. On at least two occasions she demanded that Mrs. Crockett vacate the premises, or asked, in a manner that was offensive to Mrs. Crockett, when she expected to move.

These demands were communicated to Mr. Ward, who, on July 15, 1944, drove from Salem to Sugar Grove for the purpose of settling the difficulty or quarrel which had arisen between his sister and his wife.

The testimony is contradictory as to what happened that night. Mrs. Ward states that she was very tired and had retired early. Between 10:00 and 11:00 P. M., she was awakened and found that her husband had arrived. She offered to get up and prepare supper for him. After a few moments she went to her room with the children and told her husband to sleep in another room. Her husband came upstairs and found her bedroom door locked. He requested that she open the door so that they could discuss the matter. She wanted to postpone the discussion until the next day. She finally opened the door and, as she did so, her husband grabbed her wrist and tried to drag her into the other room. She resisted. He choked her and knocked her up against the wall and tore her nightgown. She eluded him and, barefooted and in her night clothes, went across the road to the home of Mrs. Blevins. When she discovered that Mrs. Blevins had guests, she went on to the home of Mr. and Mrs. Choate, who tried to console her and persuaded her to go to bed. About thirty minutes later, Mr. Ward drove up and asked Mr. Choate to tell his wife that his daughter was

crying and wanted her. Mr. Ward, with Mrs. Choate and Mrs. Ward, drove back to his wife's home. Mr. Ward took Mrs. Choate back to her home and drove on to his own farm.

Mr. Ward denies that he struck or attempted to strike his wife, but stated that, in attempting to discuss the difficulty which had arisen between Mrs. Crockett and Mrs. Ward, Mrs. Ward became very angry, flew into a rage, awakened the children, and, while so enraged, left the home and went to Mrs. Choate's; that his daughter, Frances, became frightened and went over to Mrs. Blevins'. Neither the husband nor the wife seems to have told their neighbors any of the details of their difficulty. Mr. and Mrs. Choate said that, when Mrs. Ward arrived at their home, they noticed a slight rip in her gown and that she was in a highly nervous state and crying. Neither saw marks or scratches on Mrs. Ward's face or neck. The next day Mrs. Ward called in several relatives for consultation and advice. Mr. Ward returned to his apartment in Salem without returning to see his wife and children.

Within three weeks from the date of this difficulty, Mrs. Ward caused a warrant to be issued against her husband charging him with non-support. By agreement of counsel, the trial justice entered an order directing Mr. Ward to pay $30 a week for the maintenance and support of his wife and children. A few days later, on or about the 7th of August, this suit for divorce was instituted. Thereafter Mr. Ward voluntarily paid his wife $60 a month for the support and maintenance of herself and children at Sugar Grove.

After the order was entered by the trial justice of Smyth county, Mr. Ward sought a reconciliation with his wife and claims that on August 19 the reconciliation was consummated. Mrs. Ward notified the attorneys by telephone not to proceed with the suit, that she and her husband had become reconciled. The parties spent the night together at Mrs. Ward's home. The next morning Mrs. Ward was running a temperature and seemed to be ill. Her husband

drove her to the hospital in Marion and put her in charge of a doctor. The doctor stated that his examination disclosed that Mrs. Ward was 43 years of age, poorly nourished, very nervous, emotional and seized with spells of crying. Her blood pressure was low and she had an irregular heart with a feeble pulse. The doctor's diagnosis was that she was climateric—that is, a change in life was approaching. He prescribed for her and ordered a rest. She stayed in the hospital for ten days and then returned to her home in Sugar Grove.

Mrs. Ward concedes that her husband came to see her on August 19 and talked to her of reconciliation but states that none was actually achieved. She said that her husband spent the night in the same house with her but that they occupied separate rooms. She further admitted that her husband took her to the hospital, put her in charge of the local doctor and agreed to pay her hospital and medical bills.

While in the hospital Mrs. Ward, by letter, directed her attorneys not to proceed with the divorce case as she thought she and her husband would become reconciled, but stated that she would not sign any agreement until it had been approved by them. She asked that the bills for services to date be sent to her. A few days later, while still in the hospital, Mrs. Ward wrote her husband a long letter, in which she said that her relatives strongly opposed her becoming reconciled to him, but that she would return temporarily to him in Salem on two conditions: First, that he move his sister, Mrs. Crockett, out of his farm house not later than November 1st; and second, that he promise in writing to give her three-fourths of his salary of $3,000 a year for the support of herself and two children. She said that she meant for her husband to make these payments of $168 a month whether she was living with him in Salem or living in a separate establishment at Sugar Grove. In the letter, she stated: "Get this straight, you have until Saturday to get me a copy of the notice to Less (Mrs. Crockett) for her to move. This is the last chance I am giving you I would advise you to make yourself scarce in Rye Valley

until you get Less out due to a conversation which was overheard between Less and Marietta. I don't believe part of it is true and I know part of it is true two pairs of ears heard it and you will get the blame for it I fear. Don't come to the house until things are settled write me or Funk (one of her attorneys). I don't want to argue with you, and you will be busy."

Failing to receive a reply to this letter, Mrs. Ward, on September 7, sent her husband the following telegram:

"When will Leff (Mrs. Crockett) move wire today your last chance important—"

It is clear from the evidence that from 1940 to July 15, 1944, the husband was not guilty of the breach of any marital duty. During these four years he repeatedly informed his wife that he was unable to maintain two establishments—one in Salem, where he was compelled to live in order to perform his official duties, and one in Sugar Grove. The wife's refusal to return to her husband's abode was based on flimsy excuses. She was determined to manage her own property, including the operation of the mill, over the objection of her husband, and to occupy her husband's farm house, regardless of the cost and inconvenience to him. Failing to get her husband's consent to the use of his farm house, she attempted to force Mrs. Crockett, his tenant, to vacate the house so that she could live there. She deliberately refused to perform her marital duties. These actions were the cause of the difficulty which occurred on the night of July 15, 1944. She has magnified the actions of her husband on that night and he has minimized them. Neither party was justified in the course he or she pursued. They gave different accounts of the acts of condonation—that is, Mrs. Ward agrees with her husband in every act of condonation except that she claims she did not have intercourse with him on the night of August 19. But, whether she did or not, her statement and her acts clearly reveal that she had no cause to fear that her husband would do her bodily harm.

These facts do not warrant the court in granting a divorce *a mensa* on the ground of cruelty.

In *Miller* v. *Miller*, 140 Va. 424, 427, 125 S. E. 220, we held: "The Virginia statute authorizes a divorce to be granted 'for cruelty' or 'reasonable apprehension of bodily hurt.' Code of Virginia, 1919, section 5104.

"In *Myers* v. *Myers*, 83 Va. 806, 6 S. E. 630, it is said: 'If it appear from the whole case that the conduct of the guilty party is such as tends to endanger the life, limb or health of the other party, or such as to render cohabitation unsafe or improper, then the court can have no hesitation in granting the divorce on either ground.'

" 'The test is whether or not the husband has so treated his wife as to inflict bodily injury upon her, or cause reasonable apprehension of suffering or injury to her physically or mentally.' Browne & Watts on Divorce (9th Ed. 1921), page 73."

It is clear from the evidence introduced in behalf of appellant that her refusal to live with her husband was not based upon any bodily injury that he had inflicted upon her, or because she had any reasonable apprehension that he would do so. Her refusal was based upon her husband's failure to agree to give her three-fourths of his income and his refusal to make his farming operations subordinate to the conduct of her mill.

The decision of the case is controlled by the principle enunciated in *Montgomery* v. *Montgomery*, 183 Va. 96, 101, 31 S. E. (2d) 284, where we quoted from *Butler* v. *Butler*, 145 Va. 85, 88, 133 S. E. 756, to the following effect: " 'The law does not permit courts to sever marriage bonds and to break up households merely because husband and wife, through unruly tempers, lack of patience and uncongenial natures, live unhappily together. It requires them to submit to the ordinary consequences of human infirmities and unwise selections, and the misconduct which will form a good ground for legal separation must be very serious and such as amounts to extreme cruelty, entirely subversive of the family relations, rendering the association intolerable.' "

Appellant, in her brief and oral argument, stressed the

mental cruelty inflicted upon her by the husband's statements in one or two letters that he wrote her after the institution of the suit, in which he threatened to expose some alleged misconduct on her part before marriage. These letters, for reasons satisfactory to the parties, were not filed as exhibits, hence the court is in no position to truly evaluate their weight. The extracts from the letters, stated in questions propounded to the husband, reflect no credit upon him. It is useless to recount additional acts of unkindness committed by each of the parties. Neither has exercised that degree of forbearance which is necessary to make the voyage upon the sea of matrimony happy and successful.

We find no reversible error in the decision of the learned chancellor, whose conclusion on a conflict in the evidence is entitled to great weight. We agree with him in the concluding part of his able opinion, in which he said that these parties, if not for their own interest, at least for the sake of their children's future and happiness, should eliminate their differences and resume marital relations at that domicile which the husband may select as the best suited to promote the mutual advantages and happiness of themselves and their children.

The attorneys for appellant request compensation for the services rendered her in this court. In view of the substantial sums already awarded these attorneys, we think an additional fee of $150 is reasonable.

The decree of the trial court is affirmed, with allowance of $150 to the two attorneys for appellant.

*Affirmed.*