## Richmond

MARGARET LYON UPCHURCH v. ROY W. UPCHURCH.

June 8, 1953.

Record No. 4054.

Present, All the Justices.

The opinion states the case.

*Horace G. Bass, George E. Bendall, Victor S. Bryant,* for appellant.

*Meade, Talbott & Tate,* for appellee.

SPRATLEY, J., delivered the opinion of the court.

On February 21, 1952, Roy W. Upchurch, hereinafter referred to as the plaintiff, filed a bill in which he charged his wife with cruelty, and with wilful desertion on February 16, 1952. He prayed for a divorce *a mensa et thoro*. His wife, Margaret Lyon Upchurch, filed an answer and cross-bill. In her answer she denied the charges of cruelty and desertion, and in her cross-bill charged the plaintiff with cruelty and with requesting her to indulge in acts of sexual perversion. She prayed support for herself and their infant children; but did not ask for a divorce. The plaintiff answered the cross-bill denying each allegation therein. The evidence was heard *ore tenus*, and on May 3, 1952, the court entered a decree awarding plaintiff a divorce *a mensa et thoro* on the ground of cruelty, and denying the defendant the right to separate maintenance or alimony. The custody of their two infant children was awarded to the defendant, and the plaintiff directed to pay her $300.00 per month for each of them for their support, maintenance and education until they should respectively reach the age of twenty-one years, or until the further order of the court.

On May 23, 1952, defendant filed a petition for a rehearing on the ground of newly discovered evidence, consisting of various love letters written by the plaintiff to his secretary, a married woman; and of certain bank records which contradicted plaintiff's testimony as to money received by the defendant on behalf of plaintiff while he was in the military service. The rehearing was promptly denied.

Mrs. Upchurch, on this appeal, assigns as error the granting of the divorce to the plaintiff; the refusal of the court to award her separate maintenance or alimony; and the further refusal of the court to grant her the requested rehearing.

The plaintiff is a physician of standing and prominence in the City of Danville, Virginia, where he specializes in the field of urology. He is fifty years old, and was educataed at the University of North Carolina, the University of Virginia, and Columbia University in New York City. The defendant is the former Margaret Lyon of North Carolina. She is forty-seven years old, and was educated at Queen's College and Duke University, both in North Carolina. She has taken an active interest

in civic and religious work, especially in the Young Women's Christian Association.

Plaintiff and defendant were married in Richmond, Virginia, on October 4, 1927. They have three children, namely, Mary Susan, Margaret Ann, and Roy W. Upchurch, Jr., now respectively twenty-three, twenty-one and eighteen years of age. They lived in the home of defendant's father in Durham, North Carolina, for a little more than two years after their marriage, and then moved to Danville about January, 1930. They lived continuously together in Danville until this suit was brought. There the plaintiff practiced his profession, except for the period between May, 1942, and December, 1945, when he served in the United States Navy. Plaintiff was successful in his practice. His federal income tax returns for the years 1946-1951, inclusive, showed that he had an average annual gross income each year of more than $56,000, and an average net annual income of about $35,000.

As plaintiff's income increased, the standard of living of his family did also. Prior to the year 1940, he bought a valuable residence which he extensively remodeled. It has twenty-two rooms, seven baths, and ten telephones, with a telephone connection in every room. He gave his wife a spending allowance of as much as $350.00 per month, which he reduced to $300.00, then to $200.00 and finally to $100.00 about 1951-1952. Each child had a spending allowance of $5.00 per week. Susie, the oldest child, was allowed $100.00 per month in 1950 and 1951, when she was a student at the University of North Carolina. He provided his family with five automobiles,—a 1952 Cadillac for himself, a 1950 Cadillac for his wife, a 1951 Oldsmobile for Susie, a Jeepster for Peggy, and a 1947 Cadillac for Roy, Jr.

Plaintiff testified that his household expenses were $24,000.00 in 1950 and $20,000.00 in 1951. He paid $30.00 per week to his housemaid and $35.00 to his yard man. He carries life insurance of $159,500.00, including $250.00 per month disability provisions, upon which he pays premiums amounting to $4,000.00 a year. In 1950, he and his wife made a pledge to contribute $36,500.00 to the Memorial Hospital Building Fund in Danville, upon which he paid $21,500.00 in 1951. Payment was made in part from funds inherited from his father's estate, and in part by the transfer of certain real property of the plaintiff.

The evidence in this case is voluminous, and in sharp con-

flict upon most material matters. It shows a deplorable state of domestic discord and unhappiness between the parties during most of their married life, and especially since his return from military service, despite his financial success and their high standard of living. Fortunately, cases of this kind are somewhat rare. When they arise they give us much concern, not only on account of the consequences to the parties themselves and their families, but because of their effect upon the public. In this case there are topics of indelicacy in the private and confidential relations of the parties, to which we hesitate to allude, and to which we refer only where it is necessary. These matters already have been exposed to public scrutiny and criticism, and it will serve no useful purpose to recite them here in detail.

Plaintiff's evidence was furnished by him, his stepmother, Mrs. W. H. Upchurch, who rarely visited his home, and doctors who testified as to his physical condition. Plaintiff testified that his wife was extravagant, overspending large allowances provided by him for her and their children, especially during his absence in military service; that she borrowed money from others without his consent; that she disregarded his personal and professional welfare; that she abused and threatened him, and actually struck him on several occasions; and that this caused him worry and anxiety, which affected both his health and his professional welfare.

Specifically, he said that she borrowed money from a bank, from grocery stores which she patronized, and from members of her family; that she did not exercise proper discipline over their children; that she belittled his professional ability; that she called him "a son of a bitch," in the presence of his stepmother; that she repeatedly said she "would fix him;" that she struck him on the shoulder and neck with her pocketbook; that she threw her automobile keys at him, striking him in his mouth; that on one occasion she threatened him with a pistol; and that in the presence of one of the children she slapped him on the side of his face. He further said that when he insisted that she cooperate with him relative to money matters, she would tell him nothing and go away; and that she was addicted to the use of narcotic drugs. He accused her of further conduct and acts tending to annoy and provoke him. He denied all charges of sexual perversion. Finally, he claimed that she deserted and

abandoned him, without cause, on February 16, 1952, five days before he brought suit.

According to the evidence, plaintiff is a professional expert in his field. He drives himself hard, and on account of a feeling of insecurity works under considerable pressure and tension. Dr. Howard R. Masters, a neurologist and psychiatrist, testified that he had treated him several times. He saw him in 1938, 1939, 1940 and 1950. He found that plaintiff suffered from "spells of lassitude or depression." In 1948, plaintiff was admitted to a hospital in an unexplained stupor. When he regained consciousness, about twenty-four to forty-eight hours later, he said that he had been suffering from depression and insomnia, and when his insomnia became very bad he had taken an hypnotic capsule. In 1950, he was depressed, confused and had hallucinations. Plaintiff was worried about another urologist locating in Danville, and feared he might lose some practice to the newcomer.

Dr. Masters said that in observing the plaintiff, questioning him, and checking up on his history, he had come to the conclusion that he has "an emotional makeup of hereditary origin and is predisposed in the face of adversity to morning depression, to dread the day ahead. * * * His tension represents a state of fear, of insecurity, especially as related to the economic welfare of his family and of his personal, present and future security. Ever since his boyhood he has had an undersecretion of his pituitary gland which has accounted for his obesity or overweight and for his lassitude. This fact, plus his excessive output of work, contributes to his nighttime fatigue and to his insomnia."

In conclusion, it was Dr. Masters' opinion that "any situation or state of affairs which may threaten the doctor's economic security or person and professional welfare primarily, and the security and economic welfare of his family secondarily, will precipitate a depressed state."

Dr. F. H. McGovern, an eye specialist, testified that cataracts had begun to form on both of plaintiff's eyes; that they must eventually be removed; and that plaintiff was conscious of the impairment of his vision and anxious and disturbed over his condition.

Dr. Ralph R. Landis, a neurologist, said that he had treated plaintiff for sometime for prostate gland trouble, a trouble which

had grown progressively worse and which will eventually require an operation, and that he was also suffering from Peyronie's disease, a disease slow in developing and which had been probably present for a number of years. It was in evidence that the latter disease interferes with both normal and abnormal sexual intercourse, and is incurable.

The defendant denied in detail charges of extravagance or overspending. In the civic and church affairs in which she was interested she arranged and supervised dinners, parties and banquets. She claimed that the money spent on the household was necessary to maintain the standard of living desired by her husband. She was unable to show sums she spent for household necessities or for repairs of the home while plaintiff was in the Naval service, because he surreptitiously took all of her cancelled checks, stubs and records. She took lodgers in her home to help defray expenses.

She denied that she struck the plaintiff, or threatened or abused him on the several occasions mentioned by him, without just provocation. In stating the provocation for the incidents related by her husband, she testified as to the following incidents:

In January, 1952, a bicycle ran into the rear of the automobile operated by her. She had just had an infected tooth removed and was very nervous. She told the plaintiff about the accident. He demanded her driver's license, and ordered her not to drive any more. She went upstairs, got her keys, and when she returned he said something to his stepmother and laughed, and she then threw a leather holder containing one key at him. While it hit him in the face, she did not so intend, and he apparently was not hurt.

On another occasion, she said plaintiff told her that the other doctors in the hospital where he worked felt sorry for him being married to her and that she was just a dope fiend and should be sent away. She questioned the correctness of this. He slapped her and she retaliated. At another time, he pushed her down on the floor and told her to sit there with the lamp if she wanted to read at night, because he was tired of people telling him about their lights being on. He then struck her with his fist on the side of her head and she slapped him in the face in return. She described two other occasions, on which plaintiff struck her. She said that after he came in from playing golf on a Sunday afternoon, he cursed her, took her by the arm, turned her a "flip in

the air," and caused her to strike the kitchen cabinet, causing bruises and injury to her arm. About the year 1950, on the first night after her return home from a gall bladder operation, the plaintiff complained about her coming home so soon, hit her with his fist, and knocked her down a set of steps.

She testified that the plaintiff, from time to time, accused her of using and selling dope, and called her vile names. On one occasion he charged her with having a venereal disease. He was continuously complaining about the expenditure of money, and finally turned over to their housemaid the money to be spent for maintaining the table. She explained that her daughters were at an age where considerable expenditures were required in their behalf. She said the girls frequently entertained their male friends, and their conduct was normal and proper at all times.

It was not denied that the defendant carried lunch to her husband when he had to work in the office on Sundays; that she brought him coffee in the morning; that she warmed up his car while he was dressing; and that she advised her children not to be angry with their father for his conduct but to love and care for him.

She admitted that when worried and upset, she sometimes took sleeping pills, which her husband kept in the house in large quantities; but claimed that she had taken none since September, 1951. In 1950, she was found unconscious, apparently under the influence of some drug. In September, 1951, after being found in a condition of stupor, it was discovered that she had previously written a note declaring her intention to commit suicide. She explained that on account of the false accusations made against her by the plaintiff, she was, in each instance, driven to a state of despair and despondency, and thinking that her family had turned against her and she had nothing to live for, she took an overdose of sleeping tablets. After the last mentioned incident, she was sent to a private sanatorium. When she returned to her home, she was told by her husband that if she "got out of line" again, she would be sent to a hospital for the insane, there to be kept for the rest of her life, and he would then get a divorce from her without paying any alimony or attorneys' fees.

She said that once she went to a party with her husband and he became very drunk. She undertook to help him drive the car home; but he pushed her out, and while she was at the rear of

the car he started backing it and almost crushed her against a building. She described her husband as the "world's worse drunk," saying that "when he gets drunk, the first thing he wants to do is to fight," the next is "to prove his manliness to women," and then to belittle her.

Furthermore, the defendant testified that the plaintiff had requested her to indulge in acts of sexual perversion on the first night they were married, and had continued these requests on each occasion of their normal intercourse. She thought that her refusal to satisfy his abnormal sexual desires caused the constant strain on their relations. She explained that she did not make earlier complaint of this conduct, because of her desire to protect his name and reputation.

It appears that after plaintiff's return from the Naval service in 1945, he and the defendant occupied the same bedroom for about a week. The defendant says he then threw her clothes in the hall, told her to get out, and not to come back, and they thereafter occupied separate bedrooms upstairs. They had no sexual relations thereafter.

On February 15, 1952, Mrs. Upchurch was sick and depressed. Her father, two sisters and a brother lived in Durham, North Carolina, about sixty-five miles distant from Danville. The next day, February 16th, the two sisters of Mrs. Upchurch asked her to come to Durham for a visit because she appeared to be in a nervous and upset condition. One of the sisters called plaintiff's office to notify him of the proposed visit; but he was not in. This sister wrote a note and left it with plaintiff's cook, in which she advised plaintiff that she was taking the defendant to Durham "for a few days." Defendant took only a change of clothing with her. She was quite ill after she reached Durham, and was under the daily care of a physician for the following week. The plaintiff didn't retain the note, which was given to him by his cook; but his recollection was that defendant's sister simply said that "Margaret is with me." He did not receive a call or note from Mrs. Upchurch, and made no effort to call her.

On February 22, defendant wrote the plaintiff a letter which was duly mailed, telling him that she was feeling better and asking him for some money to have her hair fixed. The plaintiff denied receiving the letter, although he admits receiving a request for $50.00. However, on February 20th, plaintiff consulted his attorneys, and on February 21st, filed this suit. Process was

served on Mrs. Upchurch in Durham, on February 23rd. She returned to Danville in three weeks and went to the house, calling plaintiff and asking him if it would be all right for her to get her clothes. He said: "Get your damn few rags and nothing else." She got some of her clothes and left. In April, she returned to the residence in Danville; but when she was advised by plaintiff's counsel that Dr. Upchurch was upset over her being in the house, she left, and returned to the home of her father.

A number of the leading citizens of Danville who had known Mrs. Upchurch for more than fifteen years, testified that she was a devoted mother, and a person of excellent character and reputation. They praised her highly and said that they had never seen her under the influence of drugs or intoxicants. All three of the children of the parties testified favorably to their mother, and the two youngest children, both minors at that time, stated that if they had their choice, they would prefer to live with their mother.

Several witnesses testified that the plaintiff was addicted to drinking ardent spirits, and that he frequently got intoxicated. The plaintiff admitted that he was so drunk on one occasion, when he attended a medical convention, that he did not remember what happened. The defendant said that she went on the trip with him, and that he tried to push her out of a hotel window.

There are other incidents, impossible to recite within reasonable limits, tending to show the lamentable state of unhappiness in this family. Enough of the evidence, we think, already has been stated. The unstated portion is of a minor nature.

There is no evidence to support plaintiff's charge of desertion. The trial court recognized this and based its decree of divorce solely on the ground of cruelty. The defendant's departure on February 16th, on account of illness, to her former home State for a few days of rest and recreation, may be considered only as the event which offered plaintiff a pretext to file his suit for divorce. We, therefore, need consider only the question of the sufficiency of the evidence to justify his charge of cruelty against his wife.

The major portion of plaintiff's testimony is concerned with the financial affairs of himself and wife, especially after his return from the Navy in 1945. He says that in December, 1945, he found himself in debt amounting to nearly $20,000, due to his wife's extravagance. His income was reduced during his

military service. However, he continued to maintain his large mansion house and to keep up his life insurance policies. No apparent effort was made to reduce expenses by cutting down the high living standards which he established.

The 1946 Federal income tax report of plaintiff shows that he had a net return of $40,702.75 for that year. He was generous in the allowances he made to his wife and children. There were times when he granted their almost every wish. He, too, manifestly desired those things which money can procure, notwithstanding his expressed desire for thrift and his exactitude in financial accounting. The cost and unkeep of his pretentious mansion, the telephone service described, the acquisition and maintenance of five automobiles, and the rendition of other and related services, normally required a large outlay of funds.

Mrs. Upchurch had her weaknesses; but it is not difficult to understand why she followed her husband in the matter of extravagant spending. Mere financial difficulties arising from extravagance and lack of pecuniary responsibility do not amount to legal cruelty under established principles and do not constitute grounds for divorce.

No witness, save plaintiff and his stepmother, says that the defendant said or did anything unkind to him, except under circumstances of provocation. The testimony of his stepmother related to minor matters principally, and was contradicted in detail by the defendant.

There can be little doubt that the physical and mental disabilities of the plaintiff contributed to the nervous strain under which he lived and worked. Charges of actual violence to his person and threatened bodily injury lack reality, and seem to be more imaginative than real. His charges of defamatory language, and want of proper consideration are without adequate corroboration. Moreover, there is ample evidence to show that he did not run second in the field of vilification. Where he provoked the defendant to conduct alleged to constitute mental cruelty, he cannot hold her solely responsible. Nor can he hold her responsible for his physical and temperamental disabilities.

■ What constitutes cruelty as a ground for divorce has been well stated by this court in 1878, in the case of *Latham* v. *Latham,* 30 Gratt. 307, 321, as follows:

"According to the authorities, the cruelty that authorizes a divorce is anything that tends to bodily harm and thus renders

cohabitation unsafe; or, as expressed in the older decisions, that involves danger of life, limb or health. I agree there may be cases in which the husband, without violence, actual or threatened, may render the marriage state impossible to be endured. There may be angry words, coarse and abusive language, humiliating insults, and annoyances in all the forms that malice can suggest, which may as effectually endanger life or health as personal violence, and which, therefore, would afford grounds for relief by the court. But it is obvious that what merely wounds the feelings without being accompanied by bodily injury or actual menace— mere austerity of temper, petulance of manner, rudeness of language, want of civil attention and accommodation, or even occasional sallies of passion that do not threaten harm, although they be high offenses against morality in the married state, does not amount to legal cruelty.''

There is also an able and exhaustive discussion of the meaning of legal cruelty in *Myers* v. *Myers,* 83 Va. 806, 810, 6 S. E. 630, where the above statement is approved.

In *Butler* v. *Butler,* 145 Va. 85, 88, 133 S. E. 756, we said in denying the wife a divorce for cruelty and granting her husband a divorce for desertion that:

''(2) The law does not permit courts to sever marriage bonds and to break up households merely because husband and wife, through unruly tempers, lack of patience and uncongenial natures, live unhappily together. It requires them to submit to the ordinary consequences of human infirmities and unwise selections, and the misconduct which will form a good ground for legal separation must be very serious and such as amounts to extreme cruelty, entirely subversive of the family relations rendering the association intolerable.''

In *Toler* v. *Toler,* 168 Va. 302, 306, 191 S. E. 638; *Montgomery* v. *Montgomery,* 183 Va. 96, 101, 31 S. E. 2d 284; *Ward* v. *Ward,* 185 Va. 899, 906, 41 S. E. 2d 7; and *Raiford* v. *Raiford,* 193 Va. 221, 235, 68 S. E. 2d 888, we approved the above statement in *Butler* v. *Butler, supra.*

In *Crounse* v. *Crounse,* 108 Va. 108, 109, 60 S. E. 627; *Johnson* v. *Johnson,* 154 Va. 788, 798, 153 S. E. 670; and *Hendry* v. *Hendry,* 172 Va. 368, 374, 1 S. E. 2d 340, we held that charges of cruelty by one spouse against the other were not sustained by the circumstances in evidence.

 We are of opinion that while the evidence shows a de-

plorable state of affairs between the parties, it does not show that the plaintiff had sufficient reason to apprehend danger to his life, limb or health. Cohabitation between the parties was abandoned with the full acquiescence of the plaintiff, if not at his express command. In almost every instance, the conduct of the defendant was provoked by the acts of her husband. It was natural for her to defend her character and reputation, and to fight back when she was attacked. If, at times, she lost control of her nerves and speech, that could not be said to be wholly unexpected.

The evidence shows that the defendant was prepared to continue her marital relations with the plaintiff. She does not ask to be divorced from him. Five days after her departure, on account of illness, to visit her family, and less than a month after plaintiff had given her a substantial present, this suit was brought. When she returned to her home to make the best of the situation, he showed a desire to terminate their marital relations.

We cannot but conclude that the plaintiff is, as his physician testified, emotionally unstable; that this condition was not caused by his wife's conduct alone; and that he was just as much responsible for his difficulties as was the defendant. Under such circumstances, he is not entitled to be relieved of the obligations he assumed in his marriage vows. A divorce cannot be granted merely because a husband and wife are unable to live together in peace and harmony.

We are not unmindful of the force and effect of a judgment or decree, based upon evidence heard *ore tenus*.

The sufficiency of evidence to support the finding of a trial court is a question of law. Here, after a careful consideration of the record, we are of opinion that the learned chancellor of the lower court misconceived the evidence and the law applicable thereto. In our view, the evidence and circumstances clearly and strongly preponderate against the decree. We are convinced that the finding that the plaintiff is entitled to a divorce is clearly wrong. We have not hesitated under such circumstances to reverse decrees in equity causes. *Hudgins* v. *Hudgins*, 181 Va. 81, 23 S. E. 2d 774.

■ Moreover, we are further of opinion that the defendant has done nothing to forfeit her right to maintenance and support. She has given twenty-five years of her life as the wife of the plaintiff and borne him three children. She has no separate

estate, and she has no reasonable expectation that she and her husband will ever be able to live together in peace and harmony. It seems to us that it would be unjust and improper to relieve the plaintiff of all future support and obligation toward the defendant. He is well able to provide for her, he has a large income and owns property of considerable value. He has refused to effect a reconciliation, or to allow her to return to his house; and she should not be left to depend for sustenance upon the charity of her family, her friends or the public. It is proper to require him to provide reasonable funds for her separate maintenance and support. *Hughes* v. *Hughes,* 173 Va. 293, 4 S. E. 2d 402.

It is unnecessary to discuss the doctrine of recrimination, since the evidence, considered in the light most favorable to the plaintiff, fails to show that he has established that the defendant was guilty of legal cruelty.

In view of our conclusion, it is also unnecessary to consider the assignment of error relating to the refusal of the trial court to grant a rehearing of its decree of divorce, because of after-discovered evidence. We express no opinion thereon. A consideration of this assignment would further embarrass the plaintiff and members of his family, and not serve any useful purpose.

For the reasons stated, we reverse the decree of May 3, 1952, except as to the custody of the infant children and the allowance for their maintenance and support, during their minority, and remand the case, with the direction that the trial court:

(1) Dismiss the bill of the complainant; and, (2) Determine and allow a reasonable and just amount of alimony to the defendant for her separate maintenance and support, the payment of the same to be begun as of May 3, 1952, and continue until the further order of the court.

*Reversed and remanded.*