# Richmond

## Mary R. Beers v. Robert M. Beers.

January 21, 1957.

Record No. 4590.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*William W. Koontz* and *William C. Bauknight* (*Boothe, Dudley, Koontz & Boothe*, on brief), for the appellant.

*John A. K. Donovan* (*John G. Turnbull* and *Donovan & Turnbull*, on brief), for the appellee.

HUDGINS, C. J., delivered the opinion of the court.

On August 17, 1953, Robert M. Beers filed a bill for divorce in which he charged his wife, Mary R. Beers, with cruelty and wilfully deserting him on March 4, 1952. He prayed for an absolute divorce

and the custody of the two infant children. Mary R. Beers filed an answer and cross bill in which she denied the charges of cruelty and desertion on her part, and in turn charged her husband with desertion. She prayed for an absolute divorce, counsel fees, support for herself and two children and reimbursement for the sum of $21,500.00 that she alleged she had spent for hospitalization and medical care. During the taking of the depositions, and with the consent of the court, the wife withdrew her prayer for a divorce and her prayer for reimbursement of $21,500.00. The parties agreed as to the custody, care and maintenance of the children and submitted two issues to the court: (1) Whether or not the evidence established the husband's charges of wilful desertion and abandonment, and (2) whether the wife was entitled to support and maintenance. The court decided both issues against the wife, granting the husband a divorce and denying the wife's prayer for support and maintenance.

[■] The first contention of the wife, as appellant, is that the evidence taken in the form of depositions before the Commissioner, to whom the case was referred, does not support that part of the decree in which it is stated that the court found as a fact that she wilfully deserted and abandoned her husband on the 4th day of March, 1952, and that the abandonment "has continued uninterrupted since that date."

The parties were married in Montclair, New Jersey, on June 26, 1940, and lived together as husband and wife at various places in Virginia from 1942 until their separation on March 4, 1952, under circumstances which are detailed hereafter. In 1943 a son, Robert Russell Beers, was born to this union. In 1945 twins were born. One lived a few hours; the other, Stuart, survived but is mentally defective and prior to the institution of this suit had been placed in a school for mentally retarded children. In 1950 Mrs. Beers suffered a miscarriage. Later her mother died.

In 1942 the wife's father, Stanley A. Russell, an investment broker, with her share of a trust fund from her grandfather's estate, created a "custody account" for her of approximately $15,000.00. This was increased by contributions and profits from investments until in 1946 its market value was $28,676.00, from which the wife usually drew $1200.00 annually for her own use. In 1944, when she and her husband purchased a home in Falls Church, Virginia, the wife withdrew approximately $2600.00, a portion of which was used in part payment on the home. The husband contributed the sum of $1000.00

on the purchase price of this home, which sum he borrowed from Mr. Russell. Later this property was sold and the proceeds, plus additional funds furnished by the wife, were applied on the purchase of the present home, conveyed to both parties, at 4272 North Vacation Lane, Arlington, Virginia, where the wife is now living. The husband continues to pay $85.00 a month on the amortized mortgage debt on the property.

In the spring of 1946, when the husband returned from military service, he decided to organize a new corporation for the purpose of engaging in the publishing business. The wife's father and mother, for the purpose of aiding the husband in this new business venture in Washington, invested $25,000.00 in the stock of this corporation. During the next two years the husband drew a monthly salary of $300.00 from this business for the support of his family. It was his intention, with the consent of his wife, to make up the difference between this income and the living costs of the family by use of his wife's funds. As a result, his wife withdrew $4500.00 and $5300.00 from her custody account for the years 1946 and 1947, and assumed the major part of the household expenses. The publishing business under the management of the husband failed and was liquidated at the close of 1947. After the failure of the publishing business the husband secured employment with the United States Government, and his income gradually increased from $6504.00 in 1948 to $8844.00 in 1952, and $9669.00 in 1954. The depletion of the wife's custody account continued until by 1952 her account was virtually exhausted. For the years 1946 through 1952, withdrawals from this account totalled $41,000.00, and further during the same period the wife's father and mother made gifts to the wife of $9,538.00, and to the husband of $5,800.00.

This was the developing financial status of the parties when on February 7, 1951, the husband sought an interview with his father-in-law, Stanley A. Russell, for the purpose of advising him that his daughter needed treatment from a psychoanalyst. A part of Mr. Russell's testimony on this matter is as follows:

"Q. Did you discuss the situation with regard to the future if the treatment worked out?

A. Yes, sir.

Q. What was his attitude toward that, would you say?

A. Well, his explanation for the need of these treatments, as he expressed it, was that they had had difficulties and he felt these treat-

ments would be helpful, and when I heard that, it aroused my curiosity somewhat, to what extent the marriage might have deteriorated, and I asked him the direct question whether or not, if these treatments proved helpful, and she became, you might say, less difficult in his mind, what his reaction would be, and his response to me was that there was nothing he would like better, and those are his exact words.

Q. Did he tell you at the time exactly what form the difficulty that he found in the marriage took?

A. Well, as I recall, it was differences between them, perhaps arguments. Of course, all married life has those difficulties, I guess, but the question in my mind was the degree to which it had gone as far as basically undermining the marriage, which is the reason I asked him the question."

As a result of this interview the wife, upon her father's advice, began taking treatments from Dr. Joseph Abrahams of Washington, which treatments continued until May, 1952.

On February 6, 1952, the husband told his wife's father that he thought it advisable for him to leave his home and temporarily live elsewhere in order to relieve the tension and atmosphere in the home, stating that he would return on weekends and do odd jobs around the house. Mr. Russell asked him to defer action until he returned from a vacation in Florida, which he expected to do around March 1st. In the meantime, Mr. Russell consulted Dr. Abrahams to ascertain his opinion as to the impact on his daughter of the contemplated action of the husband in leaving the home. The husband and Mr. Russell had an interview on March 2, 1952, in which the husband was advised that his leaving the wife under the circumstances was a very serious matter and possibly would have a detrimental effect upon his wife. The husband promised the wife's father that he would take no definite action until they could have another interview. Two days later, on March 4, 1952, the husband wrote the wife's father that he had discussed the matter with his wife and that they had decided to separate temporarily. In the letter this is said:

"Last night, while we were having a cocktail I asked her what she thought of the idea of my moving out for the time being so as to ease the tension and pressure around the house. I told her that I had just been given an assignment in the office which would keep me extremely busy for the next month or so, which is true, and that the long period of tension at home was beginning to affect my work,

which is also true. I pointed out that, while I was not trying to engage her in a discussion of any kind, I felt that the tension wasn't helping her work out her problems either, and that all I wanted from her was a frank statement as to whether my moving out, ostensibly on a temporary basis, would be upsetting to her. She replied that it was entirely up to me, that all she planned to do was to continue her treatments and to continue on in the house as at present, but that if I felt that, because of my work, I should get away from home, then that seemed to be the sensible thing to do. Accordingly, we arranged that I would leave this morning."

Regarding this interview with his wife the husband testified:

"Q. What happened then?

A. On March 4, 1952, I moved to the University Club of Washington, D. C.

Q. Did you tell her you were going to move or did you just move?

A. I told her that I felt, what with the tension and anxieties which existed in the home at that time, it demanded some kind of relief and I felt it would be better for the boy, Russell, and for her and for me if we separated in the hope that maybe these things could be resolved in the separation.

Q. Did she object to that separation?

A. She did not object."

The husband testified that he only took a few clothes with him to the University Club of Washington, to which he moved. He stated he had no idea of staying there any length of time. He was asked:

"Q. What was going to determine how long you would stay there?

A. I would say that the factor I was trying to resolve was the difficulty; the intense hostility of the relationship in the home, which I hoped would be resolved by an easing of the conflicts by removing myself from the scene. I had no fixed ideas or intentions of doing anything except take one step at a time.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. What was the state of her health during that period, Mr. Beers?

A. I would say she was emotionally very disturbed.

Q. As a matter of fact Mr. Beers, she had been emotionally disturbed for some time prior to that, hadn't she?

A. I would say she was and had been ever since I have known her, been emotionally disturbed."

From the husband's own testimony it appears that he did not intend on March 4, 1952, to separate from his wife permanently. Indeed, he said he could not remember just when he definitely made up his mind to make the separation permanent. The wife did not desert or abandon her husband on March 4, 1952, or at any other time.

The husband contends that the wife's conduct and its effect upon him justified him in breaking off marital relations. His testimony on this issue is as follows:

"Q. Mr. Beers, what were the circumstances leading to the separation?

A. Over a period of years, the tensions between Mrs. Beers and myself were intermittent but became quite acute following the birth of Stuart. When he was about two or three years old, it became quite evident that he was retarded mentally and that had a very adverse effect on the marital relationship in the sense that Mrs. Beers was subject to violent outbursts of temper and unreasonableness; we seemed to have difficulty in sitting down together and working out constructive plans for dealing with the situation. Thereupon, he—Stuart was approximately three years old. Say in late 1947 and 1948 the relationship deteriorated to the point where it seriously affected my health. I did not know what to do about it, and in the process of trying to get some relief from this condition, I consulted Dr. Sidney Berman. During the course of my treatment with him, it became apparent that the only way I could maintain my health and recover my health and continue my work, would be to remove myself from what had become an intolerable marital situation.

\* \* \* \* \* \* \*

Q. What was the nature of these fits of temper?

A. Well, violent outbursts, which would be occasioned by relatively insignificant things. There is always a cause for those things, I suppose, but it might be in the course of conversation, the difference of a word or discussing the attitude that friends of ours had toward Stuart. Mrs. Beers was extremely sensitive to any kind of what she took to be criticism on the part of our friends, although it might not be spoken. It might be the attitude of our friends and, as a matter of fact, the outbursts were not entirely confined to me. They were also directed against our friends. Finally, it reached the point where

we had no friends and, gradually, no visitors in the home; just about all social contact stopped."

The husband testified further that on one occasion his wife pushed him and on another occasion she slapped him with her open hand on the shoulder during a mental disturbance. There is nothing in this testimony, even if corroborated, which proves that the wife's action resulted in bodily harm or threats of physical violence to her husband. We have frequently quoted with approval the following extract from *Latham* v. *Latham*, 30 Gratt. (71 Va.) 307, 320-321: ". . . . . . mere austerity of temper, petulance of manner, rudeness of language, want of civil attention and accommodation, or even occasional sallies of passion that do not threaten harm, although they be high offenses against morality in the married state, does not amount to legal cruelty."

While the testimony of the husband and his doctor indicates that the husband had become emotionally upset, it does not show that this condition was created solely by the acts of the wife. Indeed it would be unfair and unjust to decide the issue without taking into consideration the physical and mental condition of the wife. She was not called as a witness because her doctor stated that in his opinion it would have a detrimental effect on her mental condition for her to testify in her own behalf and that it "might cause a relapse of her mental illness serious enough to require hospitalization." Other uncontradicted evidence is to the effect that after March 4, 1952, when her husband left their home, she remained therein with her son, Russell, until May 16, 1952, when she went on a visit to her father's home in Montclair, New Jersey. She appeared so ill and emotionally upset to her father that he, upon the doctor's advice, obtained her admission to Payne-Whitney Clinic in New York City, where she remained until July 13, 1953. The records of the hospital, according to Dr. Peter F. Regan III, show her condition on admission to the hospital to have been as follows:

"Appearance disheveled. The patient was anxious, depressed, tearful, restless, pacing with labile emotions and rare inappropriate smiles. Talk was rather disorganized concerning the failure of psychoanalysis and was completely self-centered. At times she seemed suspicious, with a considerable thinking difficulty obviously present. At times her emotional expressions appeared histrionic and inappropriate. The whole stream of verbal production lacked unity. Memory for remote and recent past was correct. Three unrelated records were

correctly recalled in three minutes. Orientation was intact........ Calculations were refused and symbolic definitions were refused. Reasoning and judgment and insight were poor."

Dr. Regan testified that on February 18, 1953, she was transferred to his care.

"At this point the prospect of a divorce was brought up and, the patient was unable apparently to recognize the reality of the situation. Accordingly, it was decided to try and push her into making an adjustment outside the hospital without forcing the issue of a divorce. Efforts to get her into a job situation outside the hospital or to get her to adjust to social situations were unsatisfactory, and therefore it was decided to make an open attempt to get her to recognize the reality of the divorce and to plan her future in living by herself doing volunteer charity work in the community hospital library, possibly being accompanied by a companion. Discussions of the reality of this divorce situation resulted in a good deal of agonized crying during interviews, but finally she seemed to accept the idea, came to a recognition of the reality of the divorce, was beginning to make plans for the future in the light of this realization. She was transferred then at the end of March to the care of Dr. Carr. He continued with plans for the future, getting a satisfactory adjustment to the outside situation in a protected atmosphere and ultimately she was discharged from the Clinic on July 13, 1953, the plan being at this time that she would go to the Lake Placid Club with a companion, and that a similar sort of arrangement would have to be kept up indefinitely; that she would also continue in psychotherapy, it was our understanding, at Lake Placid."

The wife remained with a companion at Lake Placid until August 24, 1953, when she notified her husband, who had returned and was living at their home in Arlington, Virginia, that she expected to return home. As soon as her husband received this letter he left the home and secured living quarters elsewhere.

Dr. Hewitt Irving Varney of Chevy Chase, Maryland, testified that the wife had been under his constant care and treatment since August 31, 1953, and that he saw her two or three times a week. This doctor testified that she was suffering from schizophrenic reaction, paranoid type, and that under his treatment she had gradually improved but "is still quite tense, given to quick shifts of emotion, sudden outbursts of anger, easily disturbed by any slight or imagined slight on the part of friends or neighbors or me."

Dr. Sidney Berman, the psychiatrist called as a witness for the husband, testified that he never examined or treated Mrs. Beers, though she called by to see him and frequently telephoned him; that during the telephone conversations she "expressed great agitation and great discomfort, feeling somehow or other that if something could magically happen to her husband, then her own emotional problems would be resolved." This doctor summarized the situation thus:

"Q. In other words, it appeared to you that the emotional problem of each was dependent on each other.

A. Yes, that is the way I felt, that there was a clash of emotional conditions which existed in each one that made the relationship incompatible."

The record presents a pathetic situation. The parties lost one child, the wife had a miscarriage, the youngest child is a hopeless mental defective and has to be confined in a hospital—events which perhaps prey on the mind of a mother more than they do on that of a father. In addition, the husband suffered a heavy financial loss in a business venture of which he said "the whole situation and the business venture combined to make it rough. Of course the business venture, the way it went, was a source of considerable trouble." During the twelve years the parties lived together it became necessary for the wife to spend practically all of her separate estate that the record shows she owned, in addition to substantial gifts from her parents, for the support and maintenance of the family. This, of course, includes unusually large expenditures for medical bills. These misfortunes should have had a tendency to draw a husband and wife closer together. They certainly required patience, forbearance and consideration of one for the other. Failure of either to exercise these attributes in a reasonable manner does not justify the other in severing the marital obligations. While the wife was at the Payne-Whitney Clinic the thought of separation from the husband and Russell, her eldest child, was one source of constant worry and emotional upsets on the part of the wife. While she was at Lake Placid making strenuous efforts to regain her health and mental poise her husband, heedless of her condition, on August 17, 1953, instituted this suit for a divorce. A few days thereafter she notified her husband that she expected to return to their home, and did return on August 24, 1953. As soon as the husband ascertained this fact he, with Russell, vacated the home. The husband deserted the wife, not the wife the husband.

The following excerpt from Judge Spratley's opinion in *Upchurch* v. *Upchurch*, 194 Va. 990, at 1001, 76 S. E. 2d 170, at 177, is apropos:

"We cannot but conclude that the plaintiff is, as his physician testified, emotionally unstable; that this condition was not caused by his wife's conduct alone; and that he was just as much responsible for his difficulties as was the defendant. Under such circumstances, he is not entitled to be relieved of the obligations he assumed in his marriage vows. A divorce cannot be granted merely because a husband and wife are unable to live together in peace and harmony."

■ Appellant's next contention is that the trial court erred in refusing to award her a reasonable sum for her support and maintenance.

The support and maintenance of a wife is a legal obligation imposed by law upon the husband and is usually awarded a wife in divorce proceedings unless her misconduct is such as to forfeit this right. There is no evidence in this record that justifies the court in relieving the husband of this obligation.

The trial court is in a better position than this court to determine what is a reasonable amount to be allowed the wife for her support and maintenance. In determining this sum, the earnings of the husband, the monthly payments on the mortgage debt on the home, the necessary expenditures for the support and maintenance of the two children, and business expense, such as transportation from the home to the husband's place of business etc., as well as the needs of the wife, should be taken into consideration.

For the reasons stated, the decree granting the husband a divorce and refusing to allow the wife a reasonable sum for her support and maintenance is hereby set aside and annulled, and the case is remanded to the trial court with directions that it determine a reasonable sum to be awarded the wife for her support and maintenance, plus any necessary and reasonable attorneys' fees incurred by her in the further prosecution of this suit. On motion of the attorneys for appellant, a fee of $250.00 is allowed them for prosecuting this appeal, which will be taxed as part of the costs of the appeal.

*Reversed and remanded.*